**In re COMMODITY EXCHANGE SERVICES COMPANY, Debtor.**

**COMMODITY EXCHANGE ·SERVICES ·COMPANY, Plaintiff,**

**v.**

**The COTTON BOARD, an instrumentality of the United States Department of Agriculture and John Block, Secretary of the United States Department of Agriculture, Defendants.**

Bankruptcy No. 585–50095.
Adv. No. 585–5077.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

July 3, 1986.*

---

* This Memorandum shall constitute findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

Carroll Cobb, Lubbock, Tex., for debtor.

Nancy Koenig, Asst. U.S. Atty., Lubbock, Tex., Gregory Cooper, Howard B. Haas, Office of the General Counsel, U.S. Dept. of Agriculture, Washington, D.C., for defendant.

William T. Neary, U.S. Trustee, U.S. Dept. of Justice, Dallas, Tex.

## MEMORANDUM OF DECISION CONCERNING DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

JOHN C. AKARD, Bankruptcy Judge.

Pursuant to 11 U.S.C. § 547, the Plaintiff/Debtor-in-Possession, COMMODITY EXCHANGE SERVICES COMPANY (CXS), attempts to recover as a preferential transfer the amount of $846,500.13 paid by CXS to THE COTTON BOARD (Board) in two installments within 90 days of the filing of CXS' Petition in Bankruptcy.

The Board claims that the funds transferred to it were not the property of the Debtor because the statutory scheme enacted by Congress in the Cotton Research and Promotion Act (Act), (7 U.S.C. § 2101 *et seq.*) impressed the monies with a constructive trust. In the alternative, the Board asserts that the transfers in question were made in the ordinary course of business and, thus, are not avoidable pursuant to 11 U.S.C. § 547(c)(2).

The Cotton Research and Promotion Act was enacted by Congress as a response to the competition confronting United States cotton and cotton products from foreign-

grown cotton and other man-made fibers. 7 U.S.C. § 2101 *et seq.* The purpose of the Act and the Cotton Research and Promotion Order (Order) as well as the Rules and Regulations is to enable cotton growers to establish, finance, and carry on a program of research and promotion, to expand markets for cotton, and to improve its competitive position. 7 C.F.R. § 1205.301 *et seq.*; 7 C.F.R. § 1205.500 *et seq.* Financing for this program is by assessment on cotton producers in the amount of $1.00 plus an additional fractional assessment on each bale of cotton harvested in the United States.

A Cotton Board administers the Order. The Board was established pursuant to the Act and has authority to issue implementing regulations as approved by the Secretary of Agriculture. 7 U.S.C. § 2106. The Board is an agency of the Secretary of Agriculture and is composed of representatives of cotton producers selected by the Secretary of Agriculture from nominations submitted by eligible producer organizations. *Id.*

The Order requires certain handlers of cotton designated as "collecting-handlers" to remit to the Board on a monthly basis the $1.00 per bale assessment plus the fractional supplement on each bale of cotton handled on which that handler is the first purchaser. 7 U.S.C. § 2106(e); 7 C.F.R. § 1205.331, § 1205.511, § 1205.512, § 1205.513 and § 1205.514. The handler simply deducts the required amount from the money due to the individual cotton producer on the sale of his cotton.[1]

CXS provided an electronic marketing service to cotton producers, gins, and merchants in the southwest portion of the Cotton Belt. In essence, CXS installed computer terminals in more than 100 gins for a fee. The terminals ran through CXS' Lubbock office and from there were connected with a network of approximately 40 cotton buyers. A farmer who wanted to sell his cotton went to his gin, and asked what price was being quoted over the marketing system that day for his particular grade of cotton. A ball-park bid price would then be displayed for the corresponding grade of cotton on the display screen. If the farmer decided to sell, he told his gin which notified CXS by terminal at which time CXS contracted with the buyer for a particular number of bales at the particular grade. The farmer then mailed his warehouse receipt to CXS and the buyer sent his check to CXS. From that check, CXS deducted its commission and the assessments. The remainder was sent to the farmer. When CXS began experiencing financial difficulties, it failed to remit to many farmers who are creditors in this proceeding.

The parties agree that CXS was a collecting-handler under the Act, and that each month CXS was to withhold $1.00 per bale (as well as the supplemental fractional assessment) from the purchase price of each bale of cotton it bought from the producer-farmer. CXS was obligated to send the funds so collected (hereinafter producer assessments) along with reports concerning them, to the Board by the 10th of the following month. Through February 10, 1983, CXS timely remitted the producer assessments and reports. Subsequent to February, 1983, CXS failed to send producer assessments or reports to the Board for a period of 17 months. After numerous complaints from the Board, CXS filed late reports in July, 1984. However, due to cash flow problems, CXS made no payments to the Board at that time.

On October 8, 1984, CXS executed a promissory note to the Board, whereby it promised to pay the Board $421,319.02 on December 31, 1984 and $425,181.11 on January 31, 1985. This amount represented the unpaid assessments from approximately March 10, 1983 until July 24, 1984, plus interest. Although both payments were timely made, CXS' resulting cash position was such that it could no longer operate its business. On March 29, 1985, CXS filed for protection under Chapter 11 of the Bankruptcy Code.

---

**1.** It appears that this is the Board's primary, if not only, source of funding.

In order for the Court to determine whether the two payments made by CXS to the Board were preferential transfers which may be avoided under 11 U.S.C. § 547(b), the Court must first address the question whether CXS had an interest in the property being transferred.

The Board insists that the statutory scheme set up by the Cotton Research and Promotion Act, 7 U.S.C. § 2101 *et seq.* impressed the funds transferred by CXS to the Board with a constructive trust and further contends that the law does not require the Board to trace and identify the funds it claims. Therefore, it reasons, the monies transferred could not possibly be property of the Debtor. In support of these assertions, the Board cites *In re United Milk Products Co.*, 261 F.Supp. 766 (N.D.Ill.1966), and *In re The GSF Corporation, et al.*, (D.C.N.J., June 7, 1979, October 14, 1980) an unpublished case (hereinafter the Milk Cases). Both cases are inapposite to the instant case.

The statutory scheme, as delineated in the Milk Cases, created a Producers' Settlement Fund (PSF). The PSF insured that producers who supplied raw milk to manufacturers received a uniform price for their products. 7 U.S.C. § 608c(5)(C). The transfer made in *United Milk* was a check from the Department of Agriculture mailed to the Debtor, postpetition, and which the Debtor deposited in its own bank account. The funds were readily traceable. In this context, the Court found that the Debtor had no independent right to the sums because the raw milk producers were entitled to a uniform price regardless of the ultimate use made of their product. *In re United Milk Products Co., supra,* at 768.

*In re The GSF Corp.*, B–77–03101 (D.C. N.J.1980) (Unpublished Opinion) refers to the same statutory scheme as that outlined in *In re United Milk Products Co., supra.* In *GSF*, the Debtor claimed the PSF. The Court ruled that the fund was not part of the Debtor's estate and should be distributed to the producers. *Id.*

The Court has considered *In Re The GSF Corp.* but declines to give this unpublished decision precedential value. Both milk cases cited by the Board are distinguishable from the instant situation in that they deal with grants from government agencies, not collections from individuals. Additionally, in each case, the facts indicate that the monies in question were, in fact, traceable.

Indeed, a reading of the Cotton Research and Promotion Act, the Order, and the Cotton Board Rules and Regulations issued pursuant thereto, yields the inescapable conclusion that no trust scheme is set forth therein. Additionally, the Act nowhere directs the collecting-handler to establish a separate account for the funds which it collected from cotton producers. The Act, as its title indicates, was promulgated in order to promote research and cotton marketing in this country whereas the PSF was a separate fund from which payments were made for the direct benefit of the individual milk producers. In short, the Milk cases cited by the Board are not persuasive on the issues for which they are cited.

Additionally, contrary to the Board's contention, it is clear that both federal law and Texas law require that funds claimed as trust funds be traced and identified where commingled by the claimant thereof. *United States v. Randall,* 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971); *In Re Kennedy & Cohen, Inc.,* 612 F.2d 963 (5th Cir.1980). *See also, Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962 (5th Cir.1983).[2] The Board presented no evidence that the two payments made one year past their due dates by CXS consisted solely of assessments

---

**2.** For a definitive discussion on the requirement of tracing see the Memorandum Opinion by the Honorable Robert C. McGuire, Chief Bankruptcy Judge for the Northern District of Texas dated June 11, 1986 in *In re Behring International, Inc.,* 61 B.R. 896, *Neochem Corporation vs. Behring International, Inc. and Don Navarro, Trustee,* (Dallas, Texas). 61 B.R. 896 *See also,* Biery, *Constructive Trusts Under the Bankruptcy Code,* 1986 State Bar of Texas Advanced Business Bankruptcy Course.

amassed in the interim. After CXS defaulted on its obligation to transmit the funds to the Board because of "cash flow problems" all subsequent deposits made by CXS of monies were, of necessity, monies received for the sale of the producers' cotton. The Board elicited no testimony which showed a separate account was ever set up by CXS into which only producer assessments were placed. The evidence presented suggested that on both occasions the funds transferred consisted of commingled funds. This follows since the assessment payments would have been timely made had the specific funds which arose through assessment not already been spent previously by CXS.

It is the opinion of the Court that the Board has failed to carry its burden of proof that the two transfers from CXS to the Board were impressed by statute with a constructive trust in its favor. Additionally, the Board has failed to identify any trust res to which any such constructive trust might have attached. Therefore, the Court finds that the two transfers in question were the property of CXS at the time they were made.

Since the Court finds that the funds in question are an interest of CXS in property pursuant to 11 U.S.C. § 547(b), the next question the Court must address is: Do the transfers constitute a preference under the remainder of the section? That is, were they made (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) while the debtor was insolvent; (4) on or within 90 days before the date of the filing of the Bankruptcy Petition; and (5) did they enable the favored creditor to receive more than he would receive if the case were a liquidation case, if the transfer had not occurred, and such creditor received payment of such debt to the extent provided under the Bankruptcy Code. *Id.*

■ In the instant case, the two transfers of property to the Board took place in order to pay the Board for the 17-months-worth of assessments CXS owed the Board; thus, they were made to or for the benefit of a creditor for an antecedent debt. 11 U.S.C. § 547(b)(1), (2). The evidence before the Court showed that the Debtor was having cash flow problems sufficent that it could not pay the assessments when due and further showed that as a result of the two transfers, the Debtor was forced into bankruptcy. Thus, the transfers were made while the Debtor was insolvent. 11 U.S.C. § 547(b)(3). The first payment of $421,319.02 was made on December 31, 1984. The second payment to the Board was made on January 31, 1985. CXS filed its Petition on March 29, 1985. The Court finds that both transfers were made within 90 days before the date of the filing of the Bankruptcy Petition. 11 U.S.C. § 547(b)(4)(A). The Debtor is presumed to be insolvent on and during the 90 days immediately preceding the date of the filing of the petition and this presumption was not rebutted. 11 U.S.C. § 547(f). Finally, the Court finds that these transfers enabled the Board to receive more than it would have received if the case were a liquidation case, the transfer had not been made, and the Board received payment of its debt to the extent provided by the provisions of this title. 11 U.S.C. § 547(b)(5)(A), (B), (C).

■ Even if CXS shared an ownership interest in the account from which the payments in question were made, the two payments on the promissory note constituted preferential transfers because the funds in that account were available to CXS' general creditors and CXS had exclusive control over the disposition of those funds. *Hargadon v. Cove State Bank (In re Jaggers),* 48 B.R. 33 (Bankr.W.D.Tex.1985).[3]

The Court finds that the two transfers in question constituted preferential transfers pursuant to 11 U.S.C. § 547(b).

■ The Court, having found that the transfers in question were preferential under 11 U.S.C. § 547(b), must now decide

---

3. Opinion by the Honorable Bert W. Thompson, who retired in 1985 after an illustrious career on the bench. This author practiced before Judge Thompson for 15 years, and knowing of his wisdom and sense of justice, attributes great weight to his conclusions.

whether as the Board claims in the alternative, the transfers in question were made in the ordinary course of business and, thus, are not avoidable pursuant to the exception contained in 11 U.S.C. § 547(c)(2)(B) for a transfer made in the ordinary course of business or financial affairs of the debtor and transferee. The statutory scheme set up by Congress did not contemplate payment of assessments by promissory note. CXS was to send the Board its monthly deductions from its sales of the producers cotton by the 10th of each subsequent month. The fact is inescapable that it was certainly not in the ordinary course of business for CXS to owe the Board 17–months-worth of assessments. With respect to the Board's alternative pleading that the transfers met the ordinary course of business exception found in 11 U.S.C. § 547(c)(2), the Court finds that the Board has failed to prove that the two transfers were made in payment of a debt incurred in the ordinary course of business.

Therefore, for the foregoing reasons an order shall be entered declaring that the payment of $421,319.02 and $425,181.11 by the Debtor to the Cotton Board preferential transfers in violation of 11 U.S.C. § 547(b).