**In re COMMODITY EXCHANGE SERVICES COMPANY, Debtor.**

**COMMODITY EXCHANGE SERVICES COMPANY, Plaintiff/Appellee,**

**v.**

**The COTTON BOARD, an instrumentality of the United States Department of Agriculture and John Block, Secretary of the United States Department of Agriculture, Defendant/Appellant.**

**Bankruptcy No. 585–50095.
Adv. No. 585–5077.
Civ. A. No. CA–5–86–188.**

United States District Court,
N.D. Texas,
Lubbock Division.

Nov. 13, 1986.

Carroll Cobb, Lubbock, Tex., for debtor/plaintiff/appellee.

Marvin Collins, U.S. Atty., Nancy M. Koenig, Asst. U.S. Atty., Lubbock, Tex., Gregory Cooper, Howard B. Haas, Office of the Gen. Counsel, U.S. Dept. of Agricul-

ture, Washington, D.C., for defendant/appellant.

William T. Neary, Dallas, Tex., United States Trustee.

## MEMORANDUM AND ORDER

WOODWARD, Chief Judge.

This matter came before the court on the appellant creditor's appeal from the United States Bankruptcy Court for the Northern District of Texas, Lubbock, Division. Appellant appeals an order entered on July 7, 1986, by the bankruptcy court. 62 B.R. 868. This appeal is taken pursuant to 28 U.S.C. § 158(a).

### I. *The Parties*

The appellee debtor, Commodity Exchange Services Company (hereafter CXS), provides an electronic marketing service to cotton producers, merchants, and gins in the southwest portion of the cotton belt. For a fee, CXS installed computer terminals in more than one hundred gins, and the gin terminals were connected to the offices of approximately forty cotton buyers. A farmer who wanted to sell his cotton would learn from the gin terminal the price quoted over the marketing system for a particular grade of cotton; ball-park prices would be displayed for the corresponding grade of cotton on the computer screen. If the farmer decided to sell, he gave his price to the gin which was received by CXS on the computer. Simultaneously, CXS contracted with the cotton buyer to sell the cotton bales at the agreed price plus a commission. Upon completion of this transaction, the farmer sent his warehouse receipts to CXS, and the buyer paid CXS. CXS then deposited the proceeds into its tender account, deducted its commission and the assessments, and sent the remainder to the cotton producer.

The Cotton Board (hereafter Board) was established pursuant to the Cotton Research and Promotion Act (hereafter Act), 7 U.S.C. § 2101 (1973), *et seq.*, and is authorized to issue regulations as approved by the Secretary of Agriculture, 7 U.S.C.

§ 2106 (1973). The Act was passed by Congress in response to competition from foreign-grown cotton and man-made fibers to United States cotton. The purpose of the Act was the establishment of a research and promotion program to strengthen the competitive position of United States cotton, and to maintain and to expand markets and uses for United States cotton. 7 U.S.C. § 2101 (1973). This program is financed by an assessment on cotton producers of $1.00 plus a fractional assessment on each bale of cotton produced in the United States. To effect this program, the Board is authorized to administer the Cotton Research and Promotion Order, 7 C.F.R. §§ 1205.301, *et seq.*, and the Cotton Board Rules and Regulations, 7 C.F.R. §§ 1205.-500, *et seq.*

### II. *The Facts*

Pursuant to the Cotton Research and Promotion Order (hereafter Order), "any person who purchases a bale of cotton from the producer [or grower] of the cotton shall be the collecting handler for such cotton." 7 C.F.R. § 1205.512 (1986). As such, the order requires the handler to "collect the assessment at the time the handler first makes any payment or any credit to the producer's account for the cotton." *Id.* Furthermore, "the handler shall give the producer a receipt indicating payment of the assessment." *Id.* The parties agree that CXS was a collecting-handler under the Act, was required to withhold the $1.00 and fractional assessment per bale, and was required to send said funds and the accompanying reports to the Board.

Until February 10, 1983, CXS timely remitted its producer assessments and reports. After February, 1983, CXS failed to send assessments or reports to the Board for approximately seventeen months until July of 1984. At that time, CXS filed late reports, but made no payments because it was experiencing cash flow problems.

On October 8, 1984, CXS executed a promissory note to the Board in which it promised to pay the Board the unpaid as-

sessment. Specifically, CXS promised to pay $421,319.02 on December 31, 1984, and $425,181.11 on January 31, 1985. These amounts represented the unpaid assessments owed to the Board from approximately March 10, 1983, until July 24, 1984, plus interest.

CXS made the payments on the specified dates; however, the payments depleted CXS' cash position so that it could no longer operate its business. In addition, CXS' projected revenues did not materialize as was anticipated. On March 29, 1985, CXS filed for protection under Chapter 11 of the Bankruptcy Code.

On July 15, 1986, CXS filed a complaint against the Board under 11 U.S.C. § 547. CXS sought to recover as a preferential transfer the amount of $846,500.13 paid by CXS to the Board within ninety days of CXS' filing a petition in bankruptcy. The Board moved to dismiss or for summary judgment; plaintiff then filed its motion for summary judgment.

The bankruptcy court held that the payments were preferential transfers. The bankruptcy court found that the Board failed to carry its burden of proof that the two transfers from CXS to the Board were impressed by the Act with a constructive trust in the Board's favor. Therefore, the bankruptcy court found that the two transfers were the property of CXS at the time they were made. The court then analyzed the case to the requirements of 11 U.S.C. § 547 and found that the payments were preferential transfers. Furthermore, the court rejected the Board's alternative argument, that the transfers were made in the ordinary course of business and therefore were not avoidable pursuant to the exception in 11 U.S.C. § 547(c)(2)(B).

### III. *The Parties' Allegations*

#### A. *Appellant Cotton Board*

As stated above, the bankruptcy court found that the CXS' two payments to the Board were preferential transfers under § 547. To constitute a transfer, however, the transfer must be of the debtor's proper-

ty. Appellant attacks the bankruptcy court's ruling by arguing that the funds were not the debtor's property.

The Board argues that the relationship between CXS, the cotton producers, and the Board as to the marketing order funds is created and defined by the Cotton Research and Promotion Act, and not by the trust principles applied by the bankruptcy court. The Board argues that CXS did not have an interest in the funds at issue. Instead, appellant argues that the debtor was a "conduit" between the cotton producers and the Board: that the funds belong to the cotton producers who owe the assessments to the Board. Furthermore, appellant maintains that CXS' sole role is as a handler to "facilitate the collection and payment of such assessments" by serving as a conduit. 7 U.S.C. § 2106(e) (Supp.1986).

#### B. *Appellee Commodity Exchange Services, Inc.*

CXS argues that it does have an interest in the funds because CXS controlled their disposition and designated the creditor to whom the monies were paid. Appellee also argues that the Board's acceptance of CXS' promissory note establishes a debtor-creditor relationship. The court will not consider this argument, however, because CXS failed to present it in the bankruptcy court. As an appellate court in this matter, the court will not consider this issue which is raised for the first time on appeal. *Matter of Novack,* 639 F.2d 1274, 1276 (5th Cir.1981).

### IV. *Standard of Review*

Bankruptcy Rule 8013 provides that a bankruptcy court's findings of fact are not to be set aside unless they are "clearly erroneous." The Fifth Circuit stated in *Matter of Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980), that "[a]s to all findings of fact, ... a reviewing court of a bankruptcy decision must accept the findings as found, unless they are clearly erroneous." Furthermore, this court may not reweigh the bankruptcy court's ruling unless there has been an abuse of discretion. *See In re*

*Osborne,* 42 B.R. 988 (Bkrtcy.W.D.Wis. 1984).

## V. *Analysis*

■ The issue on appeal is whether the payments CXS made to the Board were CXS' property. Although the Board argues that CXS had no interest in the funds, the evidence strongly suggests otherwise. First, CXS did not separate the assessment funds from its general monies. Instead, as a collecting handler, CXS was allowed to keep the assessment until the tenth day of the month following the month in which the assessments were collected. Furthermore, the Act places no restriction on the money's use prior to payment to the Board. Second, CXS drew the money for the payments from its tender account to which it had legal title. Third, the fact that CXS was seventeen months delinquent in its payments to the Board, and had to execute a promissory note to the Board suggests that CXS had spent the assessment funds, and used other funds it had received to pay the Board for the overdue assessments.

Even if the money did not belong entirely to CXS, CXS had such control as to make it a part of the debtor's estate. Where there is a question as to the debtor's ownership of money, "the court must determine whether the debtor had an interest in the funds such that a transfer thereof would result in a diminution of the estate." *In re Jaggers,* 48 B.R. 33, 36 (Bkrtcy.W.D.Tex. 1985).

In *Jaggers,* the debtor made two payments on a promissory note from bank accounts wherein the debtor had ownership rights, but did not own the funds in their entirety. The issue on appeal was whether the funds could be considered the property of the debtor. In resolving this issue, the court stated that it "must look to the source of the control over the disposition of the funds in order to determine whether a preference exists":

> If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid independent of the third party whose funds are being used in partial payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer. Hence, if the funds are available for payment to the creditors of the debtor generally the funds are an asset of the estate and payment thereof constitutes a diminution of the estate.

*Id.* at 36, 37.

As in *Jaggers,* CXS had control over the money that was paid to the Board. For each payment, CXS drew a check on its tender account. CXS had legal title to the account, and thus had control over the money. CXS also had the authority to designate whom to pay, and designated the Board. These two factors indicate that the payments were preferential transfers. Furthermore, the funds were available for the payment of creditors generally, thus showing that the money was an asset of the estate. By making these payments, the estate was reduced to such an extent that CXS had no cash flow and had to file for bankruptcy. Based upon *Jaggers,* the money at issue was part of CXS' estate.

After consideration of the parties' pleadings and briefs, this court finds that the $846,500.13 at issue belonged to CXS when paid to the Board. Therefore, the court affirms the bankruptcy court's ruling that the payments were the debtor's property but on different grounds. *Osborne,* 42 B.R. at 997.

Furthermore, as property of the debtor, the payments may be avoided as a preferential transfer pursuant to § 547(b). The court has reviewed the bankruptcy court's application of the § 547(b) requirements to these payments and does not find an abuse of discretion.

Accordingly, the bankruptcy court's ruling that the payments of $421,319.02 and $425,181.11 respectively to the Board were preferential transfers is affirmed. This action is remanded to the bankruptcy court for any further action.

The Clerk will furnish a copy hereof to each attorney and to each necessary party.