**In re ROYAL GOLF PRODUCTS CORP., Debtor.**

**Charles TAUNT, Trustee, Plaintiff,**

v.

**FIDELITY BANK OF MICHIGAN, Defendant.**

**Bankruptcy No. 86–02621–R.**
**Adv. No. 86–1171–R.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Nov. 10, 1987.

Joseph Ahern, Troy, Mich., for plaintiff.

Lawrence Lichtman, Bloomfield Hills, Mich., for defendant.

## AMENDED MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

### I. *Introduction*

The trustee filed this action against Fidelity Bank of Michigan ("Fidelity") to recover an alleged preferential transfer of $194,000 made from the debtor to Fidelity. The trustee alleges that the transfer occurred when Francis McMath repaid a loan owed by the debtor to Fidelity and increased the value of his security interest in the debtor's assets by a corresponding amount. The basic facts are undisputed and were stipulated by the parties in their joint pre-trial statement.

Fidelity denies that McMath's repayment of its loan to Royal Golf resulted in any preference. First, Fidelity contends that because McMath had provided Fidelity with a letter of credit, he was essentially a guarantor. Fidelity argues that when McMath repaid the Royal Golf loan, he was in effect repaying his own loan. Thus, Fidelity relies on a series of cases holding that there is no preference when a guarantor repays a debtor's loan because there was no transfer of the debtor's property.

Fidelity also asserts that McMath's repayment of the loan resulted in no increase of his security interest in Royal Golf's property and no decrease in the debtor's estate. Fidelity argues that the pre-existing security interest which McMath held in Royal Golf's assets could not have been increased because the interest included a security interest in a patent which is and was unperfected, and therefore, is voidable

by the trustee under 11 U.S.C. § 544. Thus, Fidelity argues the value of the patent is still available to unsecured creditors.

## II. *The Facts*

The following facts are taken from the joint pre-trial statement: On November 5, 1985, Fidelity loaned $194,000 to Royal Golf. Gene Hoffman, the sole officer of the debtor, personally guaranteed the loan from Fidelity to Royal Golf. Fidelity did not take a security interest in any property of Royal Golf at the time the loan was made. However, an Irrevocable Standby Letter of Credit, No. 44705, was issued by National Bank of Detroit ("NBD") on November 5, 1985, in the amount of $200,000. This letter was issued at the request of Francis McMath, who was the applicant for this letter of credit. The letter of credit names Fidelity as the beneficiary and was issued as part of the loan transaction with the debtor on November 5, 1985. The letter of credit expired on June 30, 1986. Francis McMath was personally liable to NBD for any amount paid upon the letter of credit.

The note, which evidenced the loan transaction, had a maturity date in June, 1986 and the letter of credit by its terms, remained in force for the full term of the loan. In April 1986, Royal Golf was in default on this loan. The note was not accelerated and there was no evidence that a demand was ever made on Royal Golf for payment pursuant to the note.

On April 25, 1986, Fidelity tendered a sight draft to NBD for $199,232.67 and made a request to NBD to draw on the letter of credit. However, the letter was not paid by NBD. At the request of Fidelity, the sight draft was subsequently cancelled and the unexpired, still valid, letter of credit was returned by NBD to Fidelity.

McMath made four payments to Fidelity in satisfaction of the obligation of Royal Golf to Fidelity. Two of those payments comprise the preference issue before the Court. The first payment was for $101,640, made on May 5, 1986 and the second payment was for $94,411.75, made on May 21, 1986.[1] Both of the latter payments were drawn on the Francis C. McMath Revocable Trust, National Bank of Detroit Account # 404986600. Royal Golf did not have an interest in the Francis McMath Revocable Trust.

At trial, certain additional pertinent facts were brought out through the testimony of various witnesses. Ronald Duke, a loan officer of Fidelity, testified that Fidelity was not aware of the transactions between McMath and Royal Golf which resulted in McMath's repayment of Royal Golf's loan.

Charles Taunt, the trustee, testified that there will not be a 100% distribution to the unsecured creditors. The unsecured claims amount to approximately $800,000, whereas, the primary assets are the proceeds from this lawsuit and proceeds from the sale of the patent. Therefore, it is inconceivable that the unsecured creditors could be paid in full. He further stated that the inventory which had been seized by Customs has since been abandoned to McMath, a secured creditor.

Gene Hoffman, the former president of Royal Golf, testified that as of March 14, 1986, the cost basis of the inventory was $818,000 including $179,000 worth of inventory in seizure by Customs. Furthermore, Hoffman testified that approximately $20,000 to $30,000 worth of inventory would have been sold from March to April 25, 1986.

Francis McMath testified that he decided to pay off the Fidelity loan for Royal Golf rather than permit Fidelity to draw on the letter of credit, because the latter event would have jeopardized the stock he had pledged to secure the letter of credit, and he wanted to choose which stock would be sold to satisfy the debt. McMath also testified that he knew if Royal Golf failed to

---

1. Although McMath's payments to Fidelity were made in May of 1986, the parties have focused upon April 25, 1986 as the effective date of the transfer of the security interest from Royal Golf to McMath, perhaps because that is the date of the note given by Royal Golf to McMath. The Court has not attempted to reconcile or resolve this difference, because for purposes of counting time under 11 U.S.C. § 547(b), it is irrelevant whether the transfer occurred in April or May of 1986.

pay·Fidelity on the loan, he would then become obligated to pay either Fidelity or NBD.

Lastly, Walter Zweifler, a valuation expert, testified on behalf of the trustee. As of April 25, 1986, Zweifler appraised the value of the patent at $418,000. The value of the inventory was appraised at $695,000, based upon the cost basis on March 14, 1986 of $817,676, discounted by 15%.

On or before April 25, 1986, Royal Golf had given McMath a note evidencing its obligation resulting from McMath's repayment of Fidelity's loan. McMath had previously loaned Royal Golf approximately $375,000, for which he had a security interest.

On May 30, 1986, an involuntary petition in bankruptcy was filed against Royal Golf.

III. *Whether There Was A Preference*

11 U.S.C. § 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions .of this title.

The only issue here is whether there was a "transfer of an interest of the debtor in property"; all the other elements of § 547 are clearly met.

The United States Court of Appeals for the Sixth Circuit has recently addressed this issue in somewhat similar circumstances. *In re Hartley (Mandrosa v. Peoples Banking Co.)*, 825 F.2d 1067, 1068 (6th Cir.1987), presented the question of "whether a payment by a third party to a creditor on behalf of a debtor is a voidable preferential transfer when the debtor grants security interests to the third party in exchange for payments." The facts in *Hartley* were undisputed. The debtor overdrew its account with Peoples Banking Co. by approximately $1,206,800. The debtor had previously borrowed money from Midwest (another creditor) to cover his overdrafts. On June 2, 1981, Midwest agreed to pay $500,000 directly to Peoples to cover the overdraft, in return for security interests in the debtor's real and personal property. On September 8, 1981, the debtor filed Chapter 7. Subsequently, the trustee brought an action to recover the $500,000 transfer from Midwest to Peoples, alleging it was a voidable preference.

The court held, "[T]he debtor's interest in the $500,000 was only the value of the security interests he transferred to the third party in exchange for the third party's payment [to the creditor]." *Id.* In reaching this conclusion, the court went through a lengthy analysis. The court basically looked to the issue of control; to what extent did the debtor *control* the disposition of the funds? The transfer of the funds was a voidable preference to the extent of the debtor's control. "Even where the debtor transfers a security interest in return for the loan, the payment is only a voidable preference to the extent the transaction depleted the debtor's estate." *Hartley*, 825 F.2d at 1071, citing, *Steel Structures, Inc. v. Star Manufacturing Co.*, 466 F.2d 207 (6th Cir.1972).

The court looked to *In re Commodity Exchange Servs. Co. (Commodity Exchange Servs. Co. v. The Cotton Bd.)*, 67 B.R. 313 (Bankr.N.D.Tex.1986), to determine "control". "Where there is a question as to the debtor's ownership of the

money, 'the court must determine whether the debtor had such an interest in the funds such that a transfer thereof would result in a diminution of the estate.' " 67 B.R. at 316, quoting, *In re Jaggers (Hargadon v. Cove State Bank)*, 48 B.R. 33, 36 (Bankr.W.D.Tex.1985). Any diminution in the estate, which results from the transfer, would injure the unsecured creditors.

The trustee argues that *Hartley* is applicable in the context of the transfer by McMath, which diminished Royal Golf's estate by $194,000, the value of the security interest which was concurrently transferred to him.

The first step is to determine what interest Royal Golf had in the money transferred. The court in *Hartley* held that "... Midwest [the third party transferee] controlled the disposition of the funds, and the only depletion of the debtor's estate resulted from his transfer of security interests to Midwest...." 825 F.2d at 1072. In reaching this decision, the court looked to *Steel Structures*, above, and *In re Decker (Virginia National Bank v. Woodson )*, 329 F.2d 836 (4th Cir.1964), where the courts determined that the amount of the voidable preference was equal to the value of the collateral given up by the estate to secure the new loan.

Likewise, in the present case, it must be held that Royal Golf controlled the disposition of the funds to the extent of the security interest given to McMath to secure the loan. While McMath's payment of the Fidelity loan may have been to protect his own interest in his stocks, which guaranteed the letter of credit, McMath's security interest was augmented as a result of his pre-existing security interest in any future advances made by him to or for Royal Golf. At that time, Royal Golf controlled the disposition of the repayment loan to the extent it gave security. The estate was diminished on April 25, 1986, because McMath increased his secured interest in the assets of Royal Golf, to the detriment of the remaining unsecured creditors.

Fidelity relies upon *First Bank of Danville v. Phalen*, 62 F.2d 21 (7th Cir.1932), in support of its argument that because McMath was merely paying his own independent obligation, as a guarantor on the loan, there was no preferential transfer. In *Phalen*, the trustee brought suit to recover a $3,000 payment made to the bank by the debtor. The bank held a note from the debtor, on which the debtor's two brothers were sureties. When the note became due, the debtor borrowed $3,000 from his brother to pay the bank. On the same day, the debtor executed a note and chattel mortgage to his brother to secure this new loan; the court concluded that, "[w]hatever preference there was, if any, must be found in this fact." 62 F.2d at 22. However, the court concluded that the mortgage to the debtor's brother in no way benefited the bank.

The bank's situation was not thereby improved, save only that it obtained cash in exchange for the liability of this solvent surety whose assets were the sole source of payment—assets in which no other of [Debtor's] creditors had the remotest claim or interest. *Id.*

. . . .

It is well settled that, where payment by an insolvent debtor to a creditor does not diminish the debtor's estate available for his general creditors, the payment is in no event preferential. *Id.*

This Court concludes that *Phalen* is distinguishable from the instant case. In *Phalen*, the brother loaned the debtor $3,000 to repay a note in which the brother also was liable; therefore, the mortgage that the debtor then gave his brother was *gratuitous* and without consideration. As the *Phalen* court noted, the payment to the bank did not diminish the debtor's estate and the mortgage was not related to the brother's obligation to the bank. The court stated, "If and to the extent that it effected a preference, it surely was not a preference to the bank." *Id.* Rather, it was a preference to the brother.

However, in the present case, when McMath paid Fidelity on behalf of Royal Golf, McMath simultaneously increased his secured interest in Royal Golf's assets pursuant to his pre-existing security agreement. Therefore, the "increased security"

transaction did bear a direct relation to the payments to Fidelity. The bank's position did improve to the detriment of the unsecured creditors. When McMath made the payments, Royal Golf had already given consideration in the form of the pre-existing security interest for all future advances. Therefore, McMath was not simply paying his own debt, he was paying the debt of Royal Golf for Royal Golf.

Fidelity Bank relies upon this statement in *Phalen:*

> It is ... well settled by the authorities that where a surety supplies out of his own funds the means for payment of an obligation whereon he is surety, the estate of his principal debtor is not thereby depleted, ...

62 F.2d at 22.

However, in this case, the "surety" did not supply payment *solely* out of his own funds because the pre-existing security agreement simultaneously resulted in an increase in his security interest in Royal Golf's estate. Thus, to the extent of the collateral given up by the estate to secure the payments by McMath to Fidelity, the rights of the general unsecured creditors were prejudiced and the payment was a voidable preference.

> It is not the mere form or method of the transaction that the act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted and the creditor obtains an advantage over other creditors.

*Phalen,* 62 F.2d at 23, citing, *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912).

Furthermore, recent caselaw supports this Court's conclusion with regards to "surety" payments. In *Brown v. First National Bank of Little Rock, Arkansas,* 748 F.2d 490 (8th Cir.1984), "The question on appeal [was] whether certain payments by makers or guarantors of a promissory note upon which the insolvent debtor is also liable can be avoided by the trustee as illegally preferential." The court held the payments were not voidable as preferential transfers, citing the general rule that a payment by a guarantor is not a transfer of the debtor's property. In reaching this conclusion, the court noted that the funds used to make the payment came solely from the individual co-makers, who had received *nothing* in exchange for paying off the note.

However, the court specifically noted, "The result might be different were there any evidence that the individual co-makers received money or property from [the debtor] in exchange for paying off the note. Such indirect transfers from the debtor's estate may be avoided since they result in a diminution of the bankrupt's estate." *Id.,* at 491. That is precisely the situation presented in the instant case.

Accordingly, the Court concludes that the amount of the voidable preference is equal to the value of the collateral that the debtor transferred to McMath on April 25, 1986.

### IV. *The Amount of the Preference*

The value of the collateral transferred to McMath on April 25, 1986, depends on the extent of the debtor's net equity in its property at that time. Fidelity contends that because the debtor had no equity in its estate before McMath repaid the loan, the loan repayment resulted in neither an increase in his security interest nor a diminution in the debtor's estate.

The trustee contends that the debtor had a net equity as follows: [2]

Assets

| Inventory | | |
|---|---|---|
| Cost basis (3/14/86) | | $818,000 |
| Less 15% discount | | –15% |
| Value per Zweifler | | 695,000 |
| Patent value per Zweifler | | 418,000 |
| Total | | $1,113,000 |
| Secured Debt | | $868,000 |
| Net Equity | | $245,000 |

Thus, the trustee contends that the debtor's estate did have sufficient unencum-

---

**2.** The valuation estimates determined herein have been rounded off in part because the appraisal expert did so, and in part because it is impossible to be more precise.

bered assets that upon McMath's payment of $194,000 to Fidelity, McMath's security interest was correspondingly augmented and the debtor's estate was correspondingly diminished.

Three issues arise in connection with the trustee's analysis. First, the inventory appraisal was as of March 14, 1986, and Hoffman testified that there were sales of $20,000—$30,000 from then through April 25, 1986, when the loan was repaid. The second issue arises because $179,000 worth of this inventory (at cost basis) had been seized by Customs and was not available for sale in the United States. In these circumstances, the Court concludes that the value of this inventory should be discounted 50% (rather than 15%) on account of the resulting difficulties that would arise in finding a suitable buyer.

Therefore, the inventory value on April 25, 1986 is as follows:

| | | |
|---|---|---|
| Total inventory cost basis on 3/14/86 | | $818,000 |
| Less inventory cost of sales through 4/25/86 | | 30,000 |
| Total inventory cost basis on 4/25/86 | | $788,000 |
| Less cost basis of seized inventory | 179,000 | |
| Cost basis of available inventory | 608,000 | |
| Less 15% discount per Zweifler | 91,000 | |
| Value of available inventory | | $517,000 |
| Cost basis of seized inventory | 179,000 | |
| Less 50% discount | 90,000 | |
| Value of seized inventory | | $90,000 |
| Total value of available and seized inventory | | $607,000 |

The final issue affecting the extent of the debtor's net equity on April 26, 1986 arises because McMath's security interest in the debtor's patent was unperfected. The trustee contends that this factor should not affect the calculation of the debtor's net equity because even if unperfected, the security interest was still valid as against the debtor and did prime the unsecured creditors, at least on April 25, 1986.

Fidelity contends that because the security interest was unperfected, it is voidable by the trustee on behalf of the unsecured creditors pursuant to 11 U.S.C. § 544, and therefore the estate was not diminished when McMath repaid the Fidelity loan. Fidelity further notes that be-cause the existing "secured debt" of $868,000 attached to inventory valued at only $580,000, there was no net equity in the inventory available for transfer to McMath upon his repayment of the loan.

The Court must reject Fidelity's analysis. The issue is the extent of the diminution in the debtor's estate as of April 25, 1986, when McMath repaid the loan and augmented his security interest. The subsequent involuntary bankruptcy petition against the debtor and the consequent vesting in the trustee of certain lien avoidance powers pursuant to the Bankruptcy Code did not "undo" the fact that on April 25, 1986, the debtor's estate was diminished when McMath repaid the Fidelity loan and increased his secured position.

As noted in *In re Valdecker Packing Co.*, 61 B.R. 831 (S.D.Ohio 1986); quoting, *In re M.J. Sales & Distributing Co., Inc.*, 9 BCD 1342 at 1345, 25 B.R. 608 (1982), "diminution in the debtor's estate occurs ... at the time the collateral is pledged; not when the creditor looked to its collateral for reimbursement."

Accordingly, the Court concludes that the debtor's net equity available to augment McMath's security interest on April 25, 1986 is as follows:

| Assets | |
|---|---|
| Inventory | $ 607,000 |
| Patent | 418,000 |
| Total | 1,025,000 |
| Secured Debt | $ 868,000 |
| Net Equity | $ 157,000 |

The Court finds that the debtor's estate was diminished by $157,000 on April 25, 1986 when McMath repaid the Fidelity loan and that therefore the trustee is entitled to recover that amount from Fidelity Bank pursuant to 11 U.S.C. § 547.

An appropriate order may be submitted in accordance with Local Bankruptcy Rule 120.