In re **GRAY ELECTRIC COMPANY, Debtor.**

Stuart A. **GOLD**, Trustee of Gray Electric Company, Plaintiff,

v.

**ALBAN TRACTOR CO., INC.**, and Alban Engine Power, a Division of Alban Tractor Co., Inc., Jointly and Severally, Defendants.

Bankruptcy No. 93–46788–R.
Adv. No. 95–4547–R.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Feb. 21, 1996.

Lawrence Lichtman, Birmingham, Michigan, for Plaintiff.

Roy Sgroi, Birmingham, Michigan, for Defendants.

**OPINION REGARDING MOTIONS FOR SUMMARY JUDGMENT**

STEVEN W. RHODES, Chief Judge.

Before the Court are counter-motions for summary judgment in this action to recover preferential transfers under 11 U.S.C. §§ 547 and 549. At the heart of the dispute is whether the transfers involved "an interest of the debtor in property."

### I. Facts

The debtor, Gray Electric Company, was a subcontractor on three construction contracts between DeMaria Building Company ("DeMaria") and the Federal Aviation Administration ("the FAA"): the Detroit Metropolitan Air Traffic Control Tower project ("the Tower project"); the Air Surveillance Radar System project ("the Air Surveillance project"); and the Switch House Regulator Building project ("the Switch House project"). All three were "public building or work" contracts.

Prior to being awarded the Tower project contract, DeMaria, along with its surety, Hartford Fire Insurance Co. ("Hartford"), executed a payment bond in the amount of $5,165,000 as required by the Miller Act, 40 U.S.C. § 270a *et seq.* The purpose of this payment bond is "the protection of all persons supplying labor and material in the prosecution of the work" performed under the Tower project contract. *See* 40 U.S.C. § 270a(a)(2).

In connection with the Tower project, in 1991, the debtor purchased equipment from Alban. There is no dispute that Alban timely perfected its bond claim rights. According to a November 29, 1995 letter from DeMaria's counsel to counsel for the trustee ("the November 29, 1995 letter"), DeMaria paid the debtor for the materials supplied by Alban. The debtor was then to pay Alban. However, the debtor failed to pay $411,653.81 due to Alban for the equipment. DeMaria began to withhold further payments to the debtor until arrangement could be made for the debtor to pay Alban. On August 20, 1991, Alban served DeMaria with notice of a claim for the $411,653.81.

Almost one year later, in June of 1992, Alban sued DeMaria, Hartford, and the debt-

708

or in district court to recover the amount owing on the equipment. During the district court litigation, the debtor's attorney acknowledged the amount due, that the debtor had no defense, and that the debtor had been paid for the materials Alban had supplied. On February 2, 1993, a consent judgment for $411,653.81 in favor of Alban was entered against the debtor.

Subsequently, on March 18, 1993, Alban entered into a stipulated settlement agreement with DeMaria and Hartford. This was apparently with the debtor's consent. Under the terms of the settlement agreement, DeMaria and Hartford agreed to pay Alban $411,653.81. Of that amount, $250,000 was payable upon execution of the agreement and the balance became due 120 days after. The settlement agreement also required that additional payments be made thereafter until the full amount of the settlement was paid. The agreement allowed for a delay in order for DeMaria to collect amounts that would become due to the debtor under its subcontract agreement with DeMaria, so that DeMaria could use those funds to satisfy the claims of Alban. The arrangement was satisfactory with Gray.

DeMaria issued three checks, totaling $250,000, on March 19, 1993. These three checks, in the amounts of $48,307, $89,723, and $111,970, were made payable to Alban and the debtor. According to the November 29, 1995 letter from DeMaria's counsel, the $250,000 came from funds that had been withheld from the debtor for failing to pay Alban. At DeMaria's direction, the debtor endorsed the checks and delivered them to Alban.

Subsequently, on June 17, 1993, the debtor filed for relief under chapter 7. Afterwards, DeMaria and Hartford failed to pay the balance due under the stipulated settlement agreement, and Alban returned to district court and filed an ex-parte motion to reinstate the cause of action and enter judgment by default against those two defendants. An order to that effect was entered on October 27, 1993. Then, on about November 19, 1993, DeMaria sent a check to Alban for the balance due, $161,653.81. This check was made payable solely to Alban, and fully satisfied the judgment against DeMaria and Hartford.

On June 16, 1995, the trustee filed this action against the defendants to recover the amounts of the three pre-petition checks as preferential transfers under 11 U.S.C. § 547 and the amount of the post-petition check as a preferential transfer under 11 U.S.C. § 549.

In their motion for summary judgment, the defendants argue that the checks from DeMaria do not constitute transfers of a property interest of the debtor. First, the defendants contend that DeMaria paid Alban pursuant to DeMaria's independent obligation to Alban under the Miller Act and the stipulated settlement agreement between Alban, DeMaria, and Hartford. Second, the defendants assert that under the earmarking doctrine, the payments to Alban were not preferential transfers because the debtor had no control over the funds transferred to Alban, and that the transfers in no way diminished or depleted the debtor's estate.

In response, the trustee contends the debtor did have an interest in the funds Alban received from DeMaria. First, the trustee asserts that DeMaria had an independent obligation to the *debtor* with respect to the funds used to pay Alban, in that Alban was paid with funds DeMaria owed to the debtor under their subcontract agreement. According to the trustee, DeMaria held those funds in trust for the benefit of the debtor. As for the earmarking defense, the trustee argues that because DeMaria held funds in trust for the benefit of the debtor, the transfer of some of those funds to Alban depleted the debtor's estate, and therefore the earmarking doctrine is no defense in this case.

## II. Discussion

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Under Rule 56(c), a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."

## A. The Three Pre–Petition Checks

Section 547(b) of the Code sets forth the elements of an avoidable preference:

> [T]he trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) while the debtor was insolvent;
>
> (4) made—
>
> > (A) on or within 90 days before the date of the filing of the petition; or
> >
> > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Here, the only element at issue is whether the debtor had any interest in the funds paid by DeMaria to Alban. The Code does not define the phrase, "an interest of the debtor in property." According to Collier, "The fundamental inquiry is whether the transfer diminished or depleted the debtor's estate. Generally, a transfer of money or property by a third person to a creditor of the debtor that does not issue from the property of the debtor is not a preference." 4 *Collier on Bankruptcy,* ¶ 547.03[2], at 547–24 (15th ed., 1995) (footnotes omitted). The issue has also been framed as "a conceptual problem, the answer to which turns on the debtor's immediate or constructive ownership of the property in question." *In re Flooring Concepts, Inc.,* 37 B.R. 957, 961 (9th Cir. BAP 1984).

■ Generally, payments made by a contractor to a supplier who was a creditor of a debtor subcontractor are not part of the debtor's estate where there is an independent obligation on the part of the contractor to pay the supplier. *Flooring Concepts,* 37 B.R. at 961; *Keenan Pipe & Supply Co. v. Shields,* 241 F.2d 486, 489–90 (9th Cir.1956). An independent obligation may arise from the formation of a separate contract or agreement between the contractor and the supplier. *E.g., Flooring Concepts, supra.* Or, it may arise from a statutory obligation on the part of the contractor to ensure payment to materialmen and suppliers. *E.g., Keenan Pipe & Supply Co., supra.*

■ The defendants argue that in this case, DeMaria had an independent obligation under the Miller Act to see that suppliers such as Alban were paid for work performed in furtherance of the various projects at Detroit Metropolitan Airport, such as the Tower project. It was under this independent obligation, the defendants contend, that DeMaria issued the three pre-petition checks to Alban, and thus, even though the three pre-petition checks were made payable to both Alban and the debtor, the checks were issued by DeMaria as a surety to Alban, and so the debtor had no interest in those funds.

The defendants rely on *In re Arnold,* 908 F.2d 52 (6th Cir.1990), a case that was decided under 11 U.S.C. § 549 but is otherwise analogous. In *Arnold,* the J. Harold Shankle Construction Company ("Shankle") had contracted with the State of Tennessee on a construction project; Arnold Electric Company ("Arnold"), the debtor, was its subcontractor, and Braid Electric Company ("Braid") was a supplier to Arnold. Shankle terminated its subcontract with Arnold for Arnold's failure to adequately staff the project; the day after, Arnold filed for bankruptcy relief. At that time, Arnold owed Braid for materials Braid had supplied.

The day after Arnold's filing, Shankle paid Braid a significant portion of the debt owed by Arnold in order to avoid Braid's filing a claim against retainage or the bond Shankle had posted on the project. Shankle was also obligated under its contract with the State to pay for materials supplied to subcontractors.

The trustee sought to avoid the payments Shankle made to Braid, claiming those funds

were property of the estate. The bankruptcy court ruled in favor of the trustee on the grounds that there had been insufficient evidence of an independent agreement between Braid and Shankle. Specifically, the court found that "Braid's claim against Shankle for funds arose only because of the Debtor's relationship with Shankle." *Arnold,* 908 F.2d at 54. The district court affirmed, but the Sixth Circuit reversed, holding that Shankle's payments to Braid did not constitute property of the debtor's estate, because Shankle had an independent obligation to Braid that did not involve the debtor. *Id.* at 55–56. First, the Sixth Circuit found that there was a provision in the contract between the State and Shankle imposing an obligation on Shankle to ensure that Braid was paid. Further, relying on *Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979), the Sixth Circuit found Shankle owed an independent obligation to Braid Electric even in the absence of express contract language or state statute establishing such an obligation. *Id.* Thus, because Shankle's payment to Braid arose from an obligation wholly independent from any obligation Shankle owed to Arnold, the Sixth Circuit concluded there was no basis on which to hold that the funds paid by Shankle were the property of Arnold's estate. *Id.* at 56.

The Court finds that here, as the defendants argue, DeMaria had an independent obligation under the Miller Act to see that Alban was paid for labor and materials provided on the Tower project. DeMaria filed a bond to ensure satisfaction of this obligation; that was the basis for the defendants' district court suit against DeMaria and Hartford which resulted in the settlement agreement and later a judgment in favor of the defendants. If this was the whole story, then *Arnold* would certainly be dispositive. However, the trustee has contended that DeMaria satisfied its independent obligation to Alban with funds owed to the debtor on the various construction projects, which had been withheld when the debtor failed to pay Alban. The facts clearly support this contention. As evidenced by the November 29, 1995 letter from counsel for DeMaria, it was the intent of DeMaria, Alban, and the debtor that DeMaria would use funds coming due to the debtor under the subcontracts to satisfy DeMaria's obligation to Alban because the debtor had already received funds with which to pay Alban, and had dissipated them. The defendants have presented no contradicting evidence.

The *Arnold* case was premised on precisely opposite facts. Specifically, in *Arnold,* the Sixth Circuit found that the funds Shankle paid to Braid "came from Shankle's general account, and not from segregated funds earmarked for Arnold." *Arnold,* 908 F.2d at 56. There was no evidence that Shankle used money that belonged to Arnold to pay Braid. *Id.* Accordingly, *Arnold* is not dispositive.

■ The trustee's position is bolstered by the principle that "'construction funds in the hands of a contractor are held subject to a constructive trust....'" *Arnold,* 908 F.2d at 55 (quoting *Selby,* 590 F.2d at 648). Such a trust exists even in the absence of express contractual language or a statute establishing that sort of obligation. *Id.* Thus, DeMaria had a duty to the debtor "'to see to the proper application of construction funds.'" *Id.* (quoting *Selby,* 590 F.2d at 648). That is, DeMaria had a duty to see that the debtor received the funds it was due under the Tower project, the Air Surveillance project, and the Switch House project.

The controversy in this case arises from the fact that DeMaria had independent obligations to both Alban *and* the debtor. If DeMaria had used its own funds to satisfy its obligation to Alban, there would be a very different outcome in this case. However, based on the evidence presented, this Court finds that there is no genuine issue as to the fact that DeMaria used funds that were owed to the debtor to satisfy its obligation to Alban. Therefore, the pre-petition checks constituted transfers "of an interest of the debtor in property," and are voidable.

■ The earmarking defense asserted by the defendants will not save these pre-petition transfers from being voidable preferences. Classically, the earmarking doctrine provides that where a third person makes a loan to the debtor specifically to enable him to satisfy the claim of a particular creditor, there is no preference provided there is no

diminution of the debtor's estate as a result. *Steel Structures, Inc. v. Star Mfg. Co.*, 466 F.2d 207 (6th Cir.1972); *In re Hartley*, 825 F.2d 1067 (6th Cir.1987). But as described in *In re Middle Earth Graphics, Inc.*, 164 B.R. 557 (W.D.Mich.1994), the doctrine also applies in cases where a third party provides funds to pay off a creditor, where the third party itself is a guarantor of the debtor's obligation. *Middle Earth Graphics*, 164 B.R. at 559. Where a guarantor, such as a surety, pays the debtor's obligation directly to the creditor, courts have rejected claims that such payment is a preference. *Id.* (quoting *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir.1988)).

The defendants argue that under the earmarking doctrine, the pre-petition checks are not preferences because DeMaria paid Alban as a surety, because the debtor did not control the making of the payments, and because the payments did not result in a diminution of the assets of the debtor's estate. The defendants rely on *Middle Earth Graphics*, *supra*, where the district court held that a payment made by Cadaco, who purchased game boards from the debtor, to Schwarz, a supplier to the debtor, was not a preferential transfer where Cadaco guaranteed payment to Schwarz if the debtor failed to pay Schwarz. *Middle Earth Graphics*, 164 B.R. at 560.

In contrast, the trustee relies on *In re Royal Golf Products Corp.*, 79 B.R. 695 (Bankr.E.D.Mich.1987), *aff'd*, 908 F.2d 91 (6th Cir.1990), where this Court held a voidable preference existed where McMath, a secured creditor of the debtor, repaid the debtor's obligations under a loan from Fidelity Bank of Michigan, an unsecured creditor, where such payment increased McMath's security interest in the debtor's assets pursuant to a pre-existing security agreement between McMath and the debtor, and depleted the assets available to other unsecured creditors.

The trustee contends the present case is analogous to *Royal Golf Products*, and this Court agrees. In *Middle Earth Graphics*, the guaranty by Cadaco to Schwarz was a direct and unconditional promise, to induce Schwarz to deliver supplies to the debtor for the direct benefit of Cadaco. *Middle Earth Graphics*, 164 B.R. at 560. Cadaco paid Schwarz when the debtor did not pay Schwarz within a reasonable amount of time, and paid the debtor separately for producing the finished product. There was a specific finding that this arrangement did not deplete the assets of the debtor's estate. *Id.* In this case, DeMaria had previously paid the debtor for materials supplied by Alban, and those funds were dissipated by the debtor. Later, when DeMaria satisfied its obligation to Alban as a surety by using funds that had been withheld from the debtor, the assets available to pay all unsecured creditors were depleted, as in the *Royal Golf Products* case. Thus, even though DeMaria paid Alban because of its obligation as a surety, and even though the debtor may not have had control of the funds paid to Alban, the debtor's estate was nonetheless diminished by the amount of those payments to Alban, because if the debtor had received all that it was due from DeMaria under its subcontract agreement, there would have been more assets in the debtor's estate with which to pay unsecured creditors. Therefore, the earmarking defense asserted by the defendants fails.

### B. The Post–Petition Check

Section 549 of the Code governs avoidance of post-petition transfers as follows:

   (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

   (1) that occurs after commencement of the case....

Again, the only issue is whether the funds paid by DeMaria to Alban after the debtor filed bankruptcy were property of the debtor's estate.

The foregoing analysis of the pre-petition checks applies equally to the post-petition check. The fact that the post-petition check was made payable solely to Alban does not alter the outcome because the evidence, including the November 29, 1995 letter from DeMaria's counsel, demonstrates that the source of the funds in the post-petition check was also money due to the debtor from De-

Maria under the subcontract. As previously determined regarding the pre-petition checks, the post-petition use of those funds to pay Alban constituted a transfer of property in which the debtor had an interest, an action which likewise depleted the assets of the debtor's estate. It was thus a voidable transfer under Section 549(a).

### III. Conclusion

Accordingly, the Court concludes that all four transfers are voidable preferences, and the trustee may recover the amounts of the checks from Alban under 11 U.S.C. §§ 547(b) and 549(a). The trustee's motion for summary judgment is therefore granted, and the defendants' motion for summary judgment is denied.