In re **UNDERGROUND STORAGE TANK TECHNICAL SERVICES GROUP, INC., d/b/a UST Tech, Debtor.**

Michael A. **MASON, Trustee of Underground Storage Tank Technical Services Group, Inc., d/b/a UST Tech, Plaintiff,**

v.

**ZORN INDUSTRIES, INC., Defendant.**

Bankruptcy No. 95–30841.
Adversary No. 95–3109.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division–Flint.

Feb. 13, 1997.

---

Jay L. Welford, Detroit, MI, for plaintiff.

Kenneth W. Kable, Saginaw, MI, for defendant.

*OPINION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

ARTHUR J. SPECTOR, Bankruptcy Judge.

## INTRODUCTION

Geodynamics, Inc., entered into an agreement with the United States, pursuant to which the former was to serve as general contractor for a construction project at the Air National Guard in Battle Creek, Michigan. In connection with this project, Geodynamics "subcontracted" with Underground Storage Tank Technical Services Group ("UST Tech"), which in turn "sub-subcontracted" with Zorn Industries, Inc. Zorn fulfilled its contractual obligation, which was to provide fuel storage tanks for the project. UST Tech, however, did not pay the full amount that it owed Zorn for these tanks. The outstanding balance of $18,300 was instead paid to Zorn by Geodynamics.

Less than 90 days after Geodynamics made this payment, UST Tech filed for bankruptcy relief. In this adversary proceeding, the chapter 7 trustee seeks to avoid the payment received by Zorn pursuant to 11 U.S.C. § 547(b). The Defendant filed a motion for summary judgment. For the reasons which follow, the motion will be granted.

## DISCUSSION

To successfully invoke § 547(b), the challenged "transfer" must be "of an interest of the debtor in property." 11 U.S.C. § 547(b). The Plaintiff must prove that UST Tech held such an interest. *See* 11 U.S.C. § 547(g); *see also, e.g., In re Hartley,* 825 F.2d 1067, 1069 (6th Cir.1987); *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490, 491 (8th Cir.1984).

Zorn alleges that this requirement is not met, relying primarily on *In re Arnold,* 908 F.2d 52 (6th Cir.1990). *See* Defendant's Brief at pp. 3–5. In that case, the general contractor of a construction job in Tennessee (Shankle) made two payments directly to a sub-subcontractor (Braid) on a debt owed by the debtor/subcontractor (Arnold). *Arnold,*

908 F.2d at 53–54. The trustee sought to avoid these payments, which were made post-petition, using § 549.[1] The bankruptcy court ruled in favor of the trustee with respect to a portion of the payments (amounting to $55,580.55), and the district court affirmed. *Id.* at 54.

Braid appealed to the Sixth Circuit, which characterized "[t]he critical question" as being "whether $55,580.55 of the amount paid to Braid constitutes property of Arnold." *Id.* at 55. According to the court of appeals, the bankruptcy court's affirmative answer to this question was "based upon its factual finding that Shankle's debt to Braid arose solely out of Arnold's relationship with Shankle." *Id.* Because this finding was "clearly erroneous," *id.*, the court reversed and directed "that judgment ... be entered in favor of Braid." *Id.* at 56.

The lower courts erred, the Sixth Circuit explained, because they overlooked the fact that "the contract between the State of Tennessee [which owned the project] and Shankle ... obligates Shankle to pay Braid for materials used on the project which were supplied by Braid. This contract imposed an obligation on Shankle to pay Braid independent of any relationship Shankle had to Arnold." *Id.* at 55. Since "Shankle's payment to Braid[ ] ar[ose] out of an obligation independent of any obligations [that Shankle] owed to Arnold," the court reasoned, there was "no basis upon which to conclude that the funds paid by Shankle are the property of Arnold's estate." *Id.* at 56.

*Arnold* is troubling in a couple of respects, one being the court's rather cavalier conclusion that Shankle was liable to Braid pursuant to the terms of the contract between the owner and Shankle. The contract provision upon which the court relied stated that, "[u]nless otherwise provided in the Contract Documents, the Contractor [Shankle] shall provide and pay for all labor, materials ... and other ... services necessary for the proper execution and completion of the Work." *Id.* at 54 (quoting section 4.4.1 of Tennessee's contract with Shankle).

If Braid had attempted to use section 4.4.1 as a basis for obtaining a judgment against Shankle, it would have had to establish in effect that it was a third-party beneficiary of that provision. *See generally, e.g., In re Edward M. Johnson and Assocs.*, 845 F.2d 1395, 1398–99 (6th Cir.1988) (discussing the circumstances under which a contract creates "enforceable rights" in a third party under Tennessee law). As one court noted, "[c]laims based upon a third party beneficiary theory have proven to be difficult ones for courts to entertain because the ideas behind the theory are obscure and elusive." *Moore Constr. Co. v. Clarksville Dep't of Electricity*, 707 S.W.2d 1, 7 (Tenn.Ct.App.1985). *See also id.* at 7–8 ("[D]ecisions [regarding whether a litigant can invoke the third-party beneficiary doctrine] are inconsistent and in apparent conflict.... The application of .... [this doctrine] to construction contracts has been particularly troublesome.... The law regarding third party beneficiaries has developed in Tennessee no less tortuously than it has developed in other states.").

Notwithstanding the controversial nature of the third-party beneficiary doctrine, *Arnold* glibly assumed that Braid could avail itself of it. Worse yet, this assumption was implicit: The court did not even identify the doctrine by name, much less discuss the criteria which must be satisfied before it can be invoked.

*Arnold* is also confusing because the court did not explain the purpose of its "independence" inquiry. That issue has no obvious relevance to the question of whether the estate had a property interest in the specific money that Shankle used to pay Braid. Nor

---

**1.** Whereas § 547(b) is directed at property interests owned by the debtor, § 549 refers to "transfer[s] of property of the estate." 11 U.S.C. § 549(a). However, this distinction simply reflects the fact that, with few exceptions, the debtor's property *is* the estate's property once the bankruptcy petition has been filed. *See* 11 U.S.C. § 541(a)(1) (Estate property generally comprises "all ... interests of the debtor in property as of the commencement of the case."); *see also Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) (" '[P]roperty of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.").

does it appear that the trustee argued that he held such an interest. *See Arnold*, 908 F.2d at 56 (noting the "[a]bsen[ce of] any evidence that Shankle used money that belonged to Arnold to pay Braid").

Presumably, then, the court was considering whether, by accepting payment from Shankle, Braid essentially appropriated Arnold's right of payment. Under this theory, the transfer could be likened to an involuntary seizure, such as occurs when a judgment creditor garnishees the judgment debtor's wages: In either case, the debtor has for all intents and purposes (involuntarily) transferred an account receivable to the creditor.

The contention that Braid effectively wrested an account receivable from Arnold would have carried a good deal of force if it had been established that Braid's rights vis-à-vis Shankle were defined by Arnold's rights vis-à-vis Shankle. Such is the case, for example, when a judgment creditor garnishees the judgment debtor's bank account: The creditor has a claim against the bank if, and only to the extent that, the debtor has a claim against the bank. *See, e.g., Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992) ("A person with an account at a bank enjoys a claim against the bank in an amount equal to the account balance."); *In re Battery One–Stop Ltd.*, 36 F.3d 493, 495 (6th Cir.1994) (Under Ohio law, "[a] garnishee is liable to the judgment creditor for all money, property, and credits ... *of the judgment debtor* in his possession." (citation omitted; emphasis added)). Thus when the creditor obtains payment from the bank, it is in a very real sense collecting on the debtor's account receivable: by virtue of the garnishment writ, it has in effect substituted its name for that of the debtor on the "I.O.U."

Conversely, the account-appropriation theory runs into conceptual problems if a finding is made that the preference defendant had rights against the payor that are not derivative of the debtor's rights. Under those circumstances, the analogy to a garnishment or similar action breaks down because the defendant is not capitalizing on the happenstance of an obligation running from the third party to the debtor. Hence the Sixth

Circuit's emphasis on the independent nature of Shankle's obligation to Braid: Since Braid was entitled to payment from Shankle regardless of whether Shankle paid Arnold, the trustee had no basis for claiming that Braid usurped the estate's right of payment.

So understood, the focus in *Arnold* on Braid's rights against Shankle makes sense. And the omission in that case of any discussion regarding the extent of the estate's control over the subject property is unremarkable: The control doctrine had no logical role to play if the court's perceived task was to determine whether payment to Braid was in substance payment of the debt owed by Shankle to Arnold. *See Hartley*, 825 F.2d at 1070 ("In the context of transfers by third parties [to the preference defendant], the diminution of estate doctrine asks whether the debtor *controlled* the property to the extent that he owned it and thus the transfer diminished his estate." Courts are to refer to this doctrine in cases "[w]here there is a question as to the debtor's *ownership of the money*" paid by the third party. (emphasis added; citation omitted)). *Arnold* should therefore be construed as holding that the third party's independent obligation established that the transfer did not constitute a seizure of the debtor's account receivable.

■ In attempting to distinguish *Arnold*, the trustee put a great deal of emphasis on a letter from Geodynamics to UST Tech in which the former sought (and ultimately obtained) UST Tech's "authoriz[ation] ... to pay [the] ... amount [owed Zorn by UST Tech] to ZORN ... and deduct said amount from the outstanding balance due and owing from Geodynamic to UST [T]ech." Trustee's Brief at p. 8. According to the trustee, this authorization demonstrates that Geodynamics was paying the debt that it owed to UST Tech, and thus moots the question of whether Geodynamics was independently liable to Zorn.

The trustee's reasoning goes roughly as follows. The ultimate issue in *Arnold* was whether Shankle's payment was made on account of a debt owed by Shankle to the estate or, instead, on a debt owed by Shankle to Braid. Evidence on that issue was "lacking" in *Arnold*, so the court assumed the

latter. *See id.* at p. 9. But when there is sufficient affirmative evidence to the contrary, as here in the form of UST Tech's authorization, the assumption no longer applies. *See id.*

There is little in *Arnold* which supports or negates this argument. The court noted that "one reason Shankle made the payments to Braid was because Shankle was [contractually] obligated to do so." *Arnold,* 908 F.2d at 55. But that comment appears to have been a simple aside, designed to make the point that even the parties themselves recognized a contractual obligation which the bankruptcy court had overlooked. *See id.* And other parts of the opinion arguably suggest that the result turned solely on the issue of whether the obligation existed. *See, e.g., id.* at 56 ("If section 4.4.1 of the contract between the State of Tennessee and Shankle did not exist, then th[e] fact [that Shankle's payment corresponded to the amount Shankle owed to Arnold] might carry more weight.").

In short, *Arnold* is inconclusive with respect to this point. We will therefore attempt to predict how the Sixth Circuit would rule if it were squarely presented with the trustee's argument. *See In re Pearson,* 917 F.2d 1215, 1216 (9th Cir.1990), *cert. denied,* 503 U.S. 918, 112 S.Ct. 1291, 117 L.Ed.2d 514 (1992) ("[r]eading the tea leaves" to anticipate how the Supreme Court would decide the issue under consideration); *cf. Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995) ("Since the Michigan Supreme Court has not addressed this issue, . . . we must predict how it would resolve the issue from 'all relevant data.'" (citation omitted)).

The trustee is in effect arguing that he must prevail if Zorn collected on UST Tech's account receivable, rather than on its own account receivable. The problem with this proposition is that it is purely theoretical: In practical terms, it made no difference to any of the parties which "account" Geodynamics was paying. It seems silly to make this

inherently arbitrary designation outcome-determinative.

This is not to suggest that the trustee's argument favors form over substance. Characterizing this transaction as amounting to an appropriation by Zorn of UST Tech's account receivable against Geodynamics is neither more nor less "valid" than the assertion that Zorn simply cashed in on its own account receivable.[2] But since "economic reality" provides no clear signpost, there is no reason to deviate from the course which *Arnold* suggests. If faced with this issue, then, we predict that the Sixth Circuit would opt for simplicity over technical nuance by ruling that in cases of this type the sole issue is whether the defendant had an independent right to the money received. *Cf. In re Glenn,* 760 F.2d 1428, 1435 (6th Cir.) *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985) (resolving statutory uncertainty in favor of a "result . . . [which is] primarily a pragmatic one—one that . . . is most readily capable of use"). This Court therefore concludes that even if UST Tech's authorization is tantamount to an assignment of its claim to Zorn, the latter is not precluded from successfully invoking *Arnold*'s "independence" doctrine.

 As for the applicability of that doctrine, it is surprising that neither party made the United States/Geodynamics contract a part of the record. Rather than relying on this contract, the Defendant cited the Miller Act, 40 U.S.C. § 270a *et seq.,* in arguing that Geodynamics was satisfying an independent obligation. *See* Defendant's Brief at p. 3. That Act generally requires that a party entering into a construction contract with the United States "furnish . . . [a] payment bond with a surety . . . satisfactory to . . . [the] officer [awarding the contract] for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract." 40 U.S.C. § 270a(2).

Although Zorn's contract was with UST Tech rather than Geodynamics, it nevertheless had the right to make a claim on the payment bond if UST Tech was a "subcon-

---

**2.** Under this latter scenario, UST Tech retains its claim against Geodynamics. That claim, however, is subject to Geodynamics' right of setoff for paying Zorn, a debt which rightfully should have been paid by UST Tech.

tractor" for purposes of a proviso in the Miller Act which confers such a right on "any person having [a] direct contractual relationship with a subcontractor" of the general contractor. 40 U.S.C. § 270b(a). *See MacEvoy Co. v. United States ex rel. The Calvin Tomkins Co.*, 322 U.S. 102, 108–11, 64 S.Ct. 890, 894–95, 88 L.Ed. 1163 (1944) (holding that a party which contracted with a "materialman" could not recover from the payment bond because a materialman is not a "subcontractor"). UST Tech apparently meets this criterion, as the trustee freely allowed at the hearing on the motion that Zorn had rights against the bond.

The trustee did argue, however, that Zorn's reliance on the Miller Act is misplaced because its rights thereunder are only against the bond, and not against Geodynamics itself. Thus the trustee seemed to be asserting that Geodynamics would incur no liability if Zorn had asserted its bond rights under the Miller Act. But at the hearing, he implicitly conceded that Geodynamics would be required to reimburse the surety for any payment made by the latter to Zorn on a bond claim. The trustee, then, is not arguing that Geodynamics has no liability whatsoever vis-à-vis Zorn; rather, he contends that such liability is not triggered until the surety pays the bond claim, and then runs to the surety.

The trustee's position appears to be contradictory, since the theory behind the surety's reimbursement claim against Geodynamics would presumably be that Geodynamics is liable on the bond—i.e., that Geodynamics is the principal. *See, e.g., In re V. Pangori & Sons, Inc.*, 53 B.R. 711, 716 (Bankr. E.D.Mich.1985) ("Reimbursement ... is an equitable right implied in law in favor of the surety against the principal."); John J. Petro, *The Fundamental Rights and Responsibilities of the Contractor's Surety: What Happens When the Contractor Defaults?*, 330 P.L.I./Real 299, 301 (1989) (Since "[a]ny obli-

gation for which the surety must respond must, in the first instance, be an obligation of the principal[,] ... the principal owes a duty to the surety to indemnify and hold harmless the surety from any loss, claim or liability which the surety might incur as the result of having executed a bond for the principal."). But as will be explained, the trustee's argument is unavailing even if he is correct in asserting that Geodynamics' bond liability to Zorn is only indirect.

The gist of the court's holding in *Arnold* was that Braid did not acquire the estate's account receivable because it had its own right to payment—a right which did not derive from the estate's rights against Shankle. Stated differently, the estate lost in *Arnold* because Shankle could not have satisfied its obligation to Braid by making payment to Arnold.

So too in this case. If Geodynamics had paid UST Tech instead of Zorn, the latter would continue to have a right of payment against the surety. And the surety's right of reimbursement means that Zorn's claim will in substance be paid by Geodynamics.[3] Thus there is no reasoned basis for this distinction between direct and indirect obligations: So long as the obligation is independent of the payor's obligation to the debtor, *Arnold* is applicable.

■ The Plaintiff's third and final argument against summary judgment was that Geodynamics paid Zorn with money that belonged to UST Tech. If that is so, then it would seem that *Arnold* can properly be distinguished. *See supra* p. 566–67. However, the assertion does not withstand scrutiny.

■ Whether the Debtor had the requisite interest in the money paid by Geodynamics turns on whether "that property ... would have been part of the [bankruptcy] estate had it not been transferred." *Begier v. IRS,*

3. It likely is true that, upon paying the surety, Geodynamics would then have a claim (or setoff right) against UST Tech. But that was no less true in *Arnold*: If Shankle had already paid Arnold when it made the payment to Braid, Shankle would presumably have had a reimbursement claim against the estate. Indeed, the trustee's action must have been predicated on the assumption that Shankle's payment—by giving

rise to a right of setoff—effectively worked a *pro tanto* discharge of Shankle's obligation to the estate. If there were no such setoff right, then presumably the trustee would simply have collected his account receivable from Shankle, and not worried about the latter's payment to Braid. It therefore makes no difference here whether Geodynamics would have a reimbursement right after indemnifying the surety.

496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). The issue will ordinarily be decided under state law. *See Barnhill,* 503 U.S. at 398, 112 S.Ct. at 1389 ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *In re Smith,* 966 F.2d 1527, 1530 (7th Cir.), *cert. dismissed,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992) ("The definition of an interest in property' ... is generally a matter of state law.").

In this regard, the Plaintiff did not argue that UST Tech held an explicitly created interest in Geodynamics' money, as might have been the case had the latter established an escrow to secure *UST* Tech's performance. Nor did he claim that the money in question was under UST Tech's control. Rather, the trustee argued that the money paid by Geodynamics should be deemed to have been the subject of a constructive trust in UST Tech's favor. Such a trust is an equitable remedy used by courts to prevent "unjust enrichment." *In re Omegas Group, Inc.,* 16 F.3d 1443, 1449 (6th Cir.1994) (citation omitted).

In support of his constructive-trust argument, the trustee cited the bankruptcy court's decision in *In re Gray Electric,* 192 B.R. 706 (Bankr.E.D.Mich.1996) (Rhodes, C.J.), *rev'd sub nom. Gold v. Alban Tractor Co.,* 202 B.R. 424 (E.D.Mich.1996). The facts in that case are substantially the same as here. The general contractor of several federal construction projects, DeMaria Building Company, subcontracted with Gray Electric Co., which in turn "purchased equipment from Alban" Tractor Co. *Gray Electric,* 192 B.R. at 707. Gray Electric "failed to pay $411,653.81 due to Alban for the equipment." *Id.* Alban sued the other two parties, as well as the surety. *Id.* at 707–08. In accordance with the terms of a "stipulated settlement agreement," DeMaria paid a total of $250,000 to Alban. *Id.* at 708. This payment was by means of three checks made payable to the order of Alban and Gray Electric, the latter endorsing the checks over to Alban "[a]t DeMaria's direction." *Id.* The trustee for Gray Electric's estate argued that these payments were avoidable under § 547(b). *Id.*

The only issue before the bankruptcy court was "whether the debtor had any interest in the funds paid by DeMaria to Alban." *Id.* at 709. It decided that issue in the trustee's favor. *Id.* at 710–11.

In so holding, the court stressed that the money used by DeMaria to pay Alban constituted "funds owed to the debtor on the various construction projects, which had been withheld when the debtor failed to pay Alban." *Id.* at 710. Since "DeMaria used funds that were owed to the debtor," the court apparently reasoned, the debtor had the requisite interest in those funds. *See id.* (distinguishing *Arnold, supra* p. 565, on the grounds that "[t]here was no evidence that Shankle used *money that belonged to Arnold* to pay Braid" (emphasis added)).

The court's holding was based in large part on the conclusion that the transfer diminished the debtor's estate. *See Gray Electric,* 192 B.R. at 711. Use of that criterion is misguided, however, as estate depletion is a *consequence* of a transfer of the debtor's property interest—not proof that such an interest was in fact transferred. *See Hartley,* 825 F.2d at 1070 ("[T]he court must determine whether the debtor had such an interest in the funds such that a transfer thereof would result in a diminution of the estate." (citations omitted)); *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355–56 (5th Cir.1986) ("[I]t is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." (citation omitted)); *cf. Smith,* 966 F.2d at 1536 n. 13 ("The view that 'an interest of the debtor in property' turns on a diminution of the debtor's 'estate' would seem to conflict with the Supreme Court's admonition that the property issue is simply a matter of state law.").

Also troubling is the standard used by the court in concluding that the estate had been diminished. The appropriate test in this context is whether the transferred "property ... would have been part of the estate *had it not been transferred." Begier,* 496 U.S. at 58, 110 S.Ct. at 2263 (emphasis added). *Cf. Brown,* 748 F.2d at 491 ("It must be shown that *the transfer* depleted the debtor's estate." (emphasis added)). *Gray Electric* re-

cast this sensible formulation so that the estate had a guaranteed winner:

> [T]he debtor's estate was ... diminished by the amount of th[e] payments to Alban, because *if the debtor had received all that it was due from DeMaria* under its subcontract agreement, *there would have been more assets in the debtor's estate* with which to pay unsecured creditors.

*Gray Electric,* 192 B.R. at 711 (emphasis added).

Using this mode of analysis, of course, *all* property transfers can be said to diminish the estate—even those having no conceivable nexus to the debtor or the debtor's property. And when this inquiry led to the (inevitable) conclusion that the transfer "depleted" the estate, the bankruptcy court supplied the missing link of debtor ownership under the convenient theory of constructive trust. *See id.* at 710–11.

The court's invocation of that theory leads to more problems. The court of appeals recently indicated that a constructive trust in favor of a creditor of the bankruptcy estate cannot be recognized unless it was imposed by pre-petition judicial decree. *See Omegas,* 16 F.3d at 1449–52. Yet despite the obvious implications of that case, *Gray Electric* did not discuss it.

This apparent oversight may not be serious, inasmuch as *Omegas* is potentially distinguishable. The Sixth Circuit "recognize[d] that there is dicta in *Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979) noting that various courts have held that '[i]n the absence of statute ... construction funds in the hands of a contractor are held subject to a constructive trust or an equitable assignment or an equitable lien.'" *Omegas,* 16 F.3d at 1451 (quoting *Selby,* 590 F.2d at 648). It distinguished *Selby* in cursory fashion, describing it as "limited in application to the specific exigencies of the construction industry." *Id.*

Thus *Omegas* leaves room for the argument that creditors in the construction industry are excepted from the "no-more-constructive-trusts" rule. In fact, this interpretation of *Omegas* would seem to be necessary to harmonize the Sixth Circuit's decision with Supreme Court precedent. *See Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136–41, 83 S.Ct. 232, 234–37, 9 L.Ed.2d 190 (1962) (The bankruptcy estate of a general contractor did not acquire equitable title to funds withheld from the contractor by the project owner because such title vested in the contractor's surety, which had paid the contractor's debts as required by the payment bond.[4]).

The *Omegas* rule may be inapplicable in this context for a different reason. A central premise of the court's opinion was that the constructive trust doctrine is contrary to the principle of parity among creditors. *See Omegas,* 16 F.3d at 1452 ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor."). Where, as here and in *Gray Electric,* it is the estate which seeks to invoke the doctrine, that concern is of course not implicated. *Cf. United States v. NBD Bank,* 922 F.Supp. 1235, 1243 (E.D.Mich.1996) ("The funds being sought in this case are in the hands of NBD, not Fidelity's bankruptcy estate.... Thus the rationale of the rule in *Omegas* clearly does not apply. If this court imposes a constructive trust over these funds, ratable distribution of the bankruptcy estate will not be affected because the funds are not being taken from the estate.").

To the contrary, such use of the doctrine would subserve what *Omegas* called "the equities of bankruptcy," creating a larger estate from which creditors could be paid according to the priorities of the Code. *See Omegas,* 16 F.3d at 1452. It therefore could be argued that *Omegas* does not preclude the trustee from invoking the doctrine of constructive trust.

Even if *Omegas* is inapplicable for either or both of the reasons mentioned, however,

---

4. The surety in *Pearlman* did not obtain a pre-petition declaration that it held a property interest in the funds, nor was such an interest created by statute. *See Pearlman,* 371 U.S. at 136, 83 S.Ct. at 234–35. It bears noting that while *Pearlman* was a construction case, the Court did not purport to limit its "equitable lien" rationale to the building industry. Unfortunately, *Omegas* did not mention *Pearlman,* much less attempt to distinguish it.

there are other problems with *Gray Electric*'s use of the constructive-trust doctrine. The relevant time frame for ascertaining the nature of the debtor's interest in transferred property is, of course, immediately prior to the transfer. *See Begier*, 496 U.S. at 55, 58, 110 S.Ct. at 2261, 2262–63. And there is no indication in the opinion that anything transpired during that period of time which would even remotely call for invocation of a constructive trust or similar remedy in Gray Electric's favor. *See generally* H. Jefferson Powell, *"Cardozo's Foot": The Chancellor's Conscience and Constructive Trusts*, 56 Law & Contemp. Probs. 7, 14 (Summer, 1993) (noting that "mistake, fraud, duress and undue influence" comprise the non-exhaustive list of grounds provided by the Restatement of Restitution as justifying the "deci[sion] that one has been unjustly enriched"). The bankruptcy court failed to explain, nor is it clear, how such a remedy can be used to vest Gray Electric with rights in DeMaria's money *before* it was paid to Alban. Indeed, there is not even a suggestion in *Gray Electric* that the payment itself involved mistake or some sort of misconduct.

Also troublesome is the bankruptcy court's reliance on *Arnold* for "the principle that 'construction funds in the hands of a contractor are held subject to a constructive trust.'" *Gray Electric*, 192 B.R. at 710 (quoting *Arnold*, which in turn quoted *Selby, supra* p. 571). This trust, the bankruptcy court explained, "exists even in the absence of express contractual language or a statute establishing that sort of obligation." *Id.* (citing *Arnold*).

One problem with this assertion is that neither *Selby* nor *Arnold* actually imposed a constructive trust. As the Sixth Circuit itself later acknowledged, the pertinent passage from *Selby* was *dicta*. *See Omegas*, 16 F.3d at 1451. *Arnold* simply restated this *dicta*, and did so only "to support the contractor's independent obligation to the supplier, and not—as the Bankruptcy Court would have it—to support a 'constructive trust' on behalf of the debtor subcontractor." *Gold*, 202 B.R. at 428.

Of course, the fact that *Arnold*'s reference to constructive trusts was made to illustrate a different point does not necessarily undermine the proposition that such a trust arises in favor of the debtor/bankruptcy estate with respect to "construction funds" in the hands of a contractor. But what the lower court in *Gray Electric* failed to recognize is that that proposition is incompatible with *Arnold*'s holding that Shankle's payment did not involve property in which the estate held an interest. After all, Arnold would have been just as logical (or illogical) a beneficiary of a constructive trust imposed on Shankle's money as would Gray Electric vis-à-vis DeMaria's money. Rather than focusing on the outcome in *Arnold*, the bankruptcy court was led astray by passages in that opinion which—in light of the Sixth Circuit's holding—can only be dismissed as loose talk.

A key problem with *Gray Electric* relates to its finding that the transfer involved money that DeMaria "owed" to Gray Electric. Clearly, DeMaria owed money to the debtor. But it would seem to be just as clear that the debtor had no claim to, or rights in, specific dollar bills in DeMaria's corporate coffers. Orthographic similarity notwithstanding, there is a great difference between money *owed* and money *owned*: The bankruptcy court bridged this gap with no real explanation, ruling in effect that Gray Electric had an enforceable right to be paid with the very same money that DeMaria used to pay Alban.

The bankruptcy court's decision was perhaps animated by the concern that Alban would otherwise be circumventing an undisputed policy underlying § 547(b), which is to prevent debtors from favoring one creditor over another. *See, e.g., Smith*, 966 F.2d at 1535 ("[T]he avoidance power promotes the 'prime bankruptcy policy of equality of distribution among creditors' by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate.") (quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 177–78 (1978)). But if Alban got favorable treatment, it was doled out by DeMaria, not the debtor. In fact, Alban was in this sense no different from a creditor who collects from a third-party guarantor or surety—a situation in which courts routinely hold that no *voidable* preference occurs. *See, e.g.,*

*In re Lockard*, 884 F.2d 1171, 1177 (9th Cir.1989) ("[T]he 'overwhelming weight of authority' under both the Bankruptcy Act and Code holds that a contractor has no property interest in a surety bond issued by a third-party to guarantee the contractor's performance...."); *In re Bohlen Enters.*, 859 F.2d 561, 565 (8th Cir.1988); *Brown*, 748 F.2d at 491; *cf. In re Mansfield Tire and Rubber Co.*, 660 F.2d 1108, 1113 (6th Cir. 1981) ("The insurance fund, not the debtor's estate, pays the claims for which the employer has paid the premium. Therefore, as to claims arising [while the employer was self-insured] ..., the claimants can collect from the Commission[,] which can then resort to the surety bonds pledged [by the employer] as security. These bonds are the property of the Commission and are not assets of the debtor's estate.").

It may be true that DeMaria's "special treatment" of Alban, if one wants to call it that, prejudiced the estate by giving DeMaria a setoff right that effectively rendered UST Tech's account receivable uncollectible. *But see* 11 U.S.C. § 553(b) (permitting the trustee to "recover" certain setoffs occurring within 90 days pre-petition). The simple and proper response to this point is that "prejudice" is not enough under § 547(b): The transfer has to harm the estate because it stripped the debtor of a property interest that is recognized under applicable nonbankruptcy law. That statutory requirement cannot be ignored, even for the sake of promoting the bankruptcy ideal of parity among creditors. *See generally, e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

The trustee needed to show that there is a "genuine issue" concerning the question of whether UST Tech held an interest in the money used by Geodynamics to pay Zorn. F.R.Civ.P. 56(c) (incorporated by F.R.Bankr.P. 7056). *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). In this regard, the sum and substance of his position was that the facts here are indistinguishable from the facts in *Gray Electric*, and that that case was correctly decided by the bankruptcy court. Because we disagree with the latter assertion, the Court rejects the trustee's contention that UST Tech owned the money paid by Geodynamics to Zorn.

## SUMMARY AND CONCLUSION

The gist of the Defendant's motion was that summary judgment in its favor is mandated by *Arnold*. The Plaintiff challenged that assertion by making the following allegations: (1) Geodynamics paid the debt it owed to UST Tech, rather than the debt it owed to Zorn; (2) insofar as Zorn was concerned, Geodynamics' only obligation was to reimburse the surety in the event the latter paid Zorn's bond claim; and (3) UST Tech owned an interest in the money with which Geodynamics paid Zorn.

The first allegation calls for an inquiry into which debt the parties "had in mind" when the preference defendant received the payment in question. The Court's expectation is that the Sixth Circuit would reject this hair-splitting, formalistic approach.

The second allegation is irrelevant to the underlying purpose of the "independence" test—i.e., to ascertain whether the preference defendant's right of payment was coextensive with the debtor's right of payment. The trustee's theory as to the nature of Geodynamics' obligation to Zorn may (or may not) be correct, but it in no way negates Zorn's contention that its payment right is non-derivative of UST Tech's payment right.

In contrast to the first two allegations, the third one—if correct—would be availing to the trustee. However, the trustee failed to substantiate this allegation.

For these reasons, the Defendant's motion will be granted.[5] The Plaintiff's own motion for partial summary judgment, which was premised on denial of the Defendant's motion, will be denied. Dated: February 13, 1997.

---

5. There is no need to address the Defendant's alternative argument that the property which was the subject of the transfer is excluded from the estate under the theory of (what else?) constructive trust.