In re UNDERGROUND STORAGE TANK TECHNICAL SERVICES GROUP, INC. d/b/a UST Tech, Debtor.

Michael A. MASON, Trustee of Underground Storage Tank Technical Services Group, Inc., d/b/a UST Tech, Plaintiff,

v.

SOUTHERN SANITATION, INC., Defendant.

Michael A. MASON, Trustee of Underground Storage Tank Technical Services Group, Inc., d/b/a UST Tech, Plaintiff,

v.

GARY DIRT COMPANY, INC., Defendant.

Bankruptcy No. 95–30841.
Adversary Nos. 95–3154, 95–3155.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division–Flint.

Feb. 13, 1997.

Jon A. Sherk, Detroit, MI, for Plaintiff.

Steven W. Moulton, Flint, MI, for both Defendants.

### *OPINION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT*

ARTHUR J. SPECTOR, Bankruptcy Judge.

#### INTRODUCTION

Sverdrup Environmental, Inc., entered into an agreement with the United States, pursuant to which the former was to serve as general contractor for a construction project at the Fort Campbell Military Reservation, which is located on the border between Kentucky and Tennessee. In connection with this project, Sverdrup "subcontracted" with Underground Storage Tank Technical Services Group ("UST Tech"), which in turn entered into separate subcontracts with Southern Sanitation, Inc., and Gary Dirt Co., Inc. Southern and Gary were paid for the work which they performed by means of separate checks dated May 18, 1995, in the amounts of $36,953.41 and $11,025.00, respectively. These checks were issued by Sverdrup and made payable jointly to UST Tech and the respective sub-subcontractor. UST Tech endorsed the checks and delivered each to the joint payee.

Within 90 days after these payments were made, UST Tech filed for bankruptcy relief. In these adversary proceedings, the chapter 7 trustee seeks to avoid the payments received by Southern and Gary pursuant to 11 U.S.C. § 547(b). Both parties filed a motion for summary judgment in each of the cases. For the reasons which follow, these motions will be denied.

## DISCUSSION

■■■■ To successfully invoke § 547(b), the challenged "transfer" must be "of an interest of the debtor in property." 11 U.S.C. § 547(b). The Plaintiff must prove that UST Tech held such an interest. *See* 11 U.S.C. § 547(g); *see also, e.g., In re Hartley*, 825 F.2d 1067, 1069 (6th Cir.1987); *Brown v. First Nat'l Bank of Little Rock*, 748 F.2d 490, 491 (8th Cir.1984).

■■■ The motions filed by Southern and Gary asserted that this requirement is not met, advancing several theories in support of that proposition. First and foremost among them is the Defendants' contention that they are entitled to summary judgment based on the Sixth Circuit's decision in *In re Arnold*, 908 F.2d 52 (6th Cir.1990). That case is discussed at length in an opinion entered contemporaneously herewith, involving the same Plaintiff and a different defendant. *See Mason v. Zorn Industries*, 212 B.R. 564, 565–567 (Bankr.E.D.Mich.1997). In *Zorn*, this Court concluded that "*Arnold* should . . . be construed as holding that the third party's independent obligation established that the transfer did not constitute a seizure of the debtor's account receivable." *Id.* at 567.

As in *Zorn*, the Defendants here argued that they had an "independent" right to the payment by virtue of the Miller Act, 40 U.S.C. § 270a *et seq.* That Act generally requires that a party entering into a construction contract with the United States "furnish . . . [a] payment bond with a surety . . . satisfactory to . . . [the] officer [awarding the contract] for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract." 40 U.S.C. § 270a(a)(2).

Although the Defendants contracted with UST Tech rather than Sverdrup, they nevertheless had the right to make a claim on the payment bond if UST Tech was a "subcontractor" for purposes of a proviso in the Miller Act which confers such a right on "any person having [a] direct contractual relationship with a subcontractor" of the general contractor. 40 U.S.C. § 270b(a). *See MacEvoy Co. v. United States ex rel. The Calvin Tomkins Co.*, 322 U.S. 102, 108–11, 64 S.Ct. 890, 894–95, 88 L.Ed. 1163 (1944) (holding that a party which contracted with a "materialman" could not recover from the payment bond because a materialman is not a "subcontractor"). UST Tech apparently meets this criterion, as the trustee did not dispute that the Defendants had rights against the bond.

The trustee did argue, however, that the Defendants' reliance on the Miller Act is misplaced because their rights thereunder are only against the bond, and not against Sverdrup. Thus the issue of *Arnold*'s applicability boils down to whether the Defendants would have a cause of action against Sverdrup under the Miller Act.

It could be argued that, since the Act places the onus on the general contractor to furnish the payment bond, the statute must be premised on the proposition that that party is liable to second-tier subcontractors like the Defendants. *See In re Glover Constr. Co.*, 30 B.R. 873, 880 n. 22 (Bankr. W.D.Ky.1983) ("The underlying objective of this legislation [i.e., the Miller Act] presupposes that the contractor has a fiduciary duty towards workers associated with the project."). Indeed, it appears that Miller Act bonds routinely subject the general contractor to liability for all claims made on the bond. *See* Standard Form 25A (the standard payment bond provided by the government to the general contractor of a Miller Act construction job, which states that the obligation thereunder binds the principal and surety "jointly and severally," and that the "obligation is void if the Principal promptly makes payment to all persons having a direct relationship *with the Principal or a subcontractor of the Principal*" (emphasis added));

*MacEvoy,* 322 U.S. at 103, 64 S.Ct. at 891–92 ("Pursuant to the Miller Act, MacEvoy [the general contractor] ... and ... Aetna Casualty and Surety Company ... executed a payment bond ..., conditioned on the prompt payment by MacEvoy 'to all persons supplying labor and material in the prosecution of the work provided for in said contract.'" (footnote omitted)).

The view that the Act "presupposes" liability on the general contractor's part is reinforced by a provision therein which conditions the bond rights of sub-subcontractors on the "giving [of timely] written notice to ... [the general] contractor ... stating ... the amount claimed." 40 U.S.C. § 270b(a). That notice would seem to be misdirected if, as the trustee suggests, the general contractor has no liability on claims filed by such parties on the bond. *See J.W. Bateson Co. v. United States ex rel. Board of Trustees,* 434 U.S. 586, 590 n. 4, 98 S.Ct. 873, 876 n. 4, 55 L.Ed.2d 50 (1978) (The Miller Act's notice "requirement 'permits the prime contractor, after waiting ninety days [the time period prescribed by § 270b(a)], safely to pay his subcontractors without fear of additional liability to sub-subcontractors or materialmen.' ... The notice provision thus prevents ... 'double payments' by prime contractors ...." (citations omitted)).

Given these considerations, it is perhaps not surprising that one finds *dicta* stating or at least suggesting that the general contractor is personally liable to all parties protected under the Miller Act. *See Southern Constr. Co. v. United States ex rel. Pickard,* 371 U.S. 57, 58 n. 1, 83 S.Ct. 108, 109 n. 1, 9 L.Ed.2d 31 (1962) (where the Court explained in an aside that "[u]nder the Miller Act ..., Southern as a prime contractor was secondarily liable to suppliers of the subcontractor"); *MacEvoy,* 322 U.S. at 110, 64 S.Ct. at 895 (In enacting the Miller Act, "Congress cannot be presumed ... to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself."); *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.,* 86 F.3d 332, 334 (4th Cir.1996) (*per curiam*) ("[t]he obligation of the [Miller Act] surety and con-

tractor includes amounts owed by subcontractors to their suppliers"); *Selby v. Ford Motor Co.,* 590 F.2d 642, 648 n. 12 and accompanying text (6th Cir.1979) (citing the Miller Act in support of the observation that "legislatures have increasingly found that the parties have an independent legal duty ... to see to the proper application of construction funds"); *cf. Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 141, 83 S.Ct. 232, 237, 9 L.Ed.2d 190 (1962) (where the Court ruled that a Miller Act surety who paid claims against the payment bond was equitably subrogated to the rights of the general contractor with respect to funds withheld by the owner). Indeed, one court clearly held to that effect, *see In re Gray Electric Co.,* 192 B.R. 706, 710 (Bankr.E.D.Mich.1996) (Rhodes, J.), *rev'd on other grounds sub nom. Gold v. Alban Tractor Co.,* 202 B.R. 424 (E.D.Mich.1996), and another court arguably so held. *See United States ex rel. S.C.I. Constr. Co. v. Gajic,* 684 F.Supp. 190, 191 (N.D.Ill.1988).

However, none of the cases cited even acknowledged the fact that the Miller Act contains no provision which specifically states that the general contractor is liable to sub-subcontractors. Given that statutory omission, and the absence of any persuasive judicial authority to the contrary, the Court infers that a general contractor would not be in violation of the Act if it were to supply a bond in which the surety's liability for claims made thereon by sub-subcontractors is defined solely by the liability of the respective subcontractor, with the general contractor having no liability for such claims. Accordingly, the Court rejects the proposition that the Defendants have (or would have had) a direct cause of action against Sverdrup under the Miller Act.

As suggested above, it may be that Miller Act sureties invariably require the general contractor to assume liability with respect to all claims made on the bond. More specifically, it could well be true that the bond which Sverdrup obtained from Reliance Insurance Company—the surety for this construction project—establishes such liability.

In fact, counsel for the trustee conceded during oral argument that Reliance would

probably be entitled to reimbursement from Sverdrup in the event that Reliance paid either of the Defendants' bond claim. *Cf. Zorn,* 212 B.R. at 569. And if that is so, then for all intents and purposes Sverdrup owed an independent obligation to the Defendants which would bring this case within the scope of the holding in *Arnold. See id.*

In contrast to *Zorn,* however, the trustee here did not stipulate that Reliance had such recourse under the terms of the bond. And for whatever reason, the Defendants did not submit a copy of the bond into evidence. We therefore must assume that the bond does not subject Sverdrup to liability for UST Tech's debts. *See, e.g., Martin v. Telectronics Pacing Systems, Inc.,* 105 F.3d 1090, 1092 (6th Cir.1997) ("In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party....").

The Defendants, then, have not satisfied this Court "that there is no genuine issue" with respect to their contention that Sverdrup was independently liable to the Defendant. F.R.Civ.P. 56(c) (incorporated by F.R.Bankr.P. 7056). As a consequence, there would seem to be a triable issue of fact as to whether the Defendants "effectively wrested an account receivable from" UST Tech. *Zorn,* 212 B.R. at 567. But the Defendants raised another argument which, at first blush, seems to bear on that same issue.

■ Sverdrup's contract with UST Tech provided in section 8.1.6 as follows:

> [UST Tech] warrants and guarantees that title to all Subcontract Work, materials and equipment covered by an Application for Payment ... will pass to the Owner upon receipt of such payment by [Sverdrup] free and clear of all liens, claims, security interests or encumbrances hereinafter referred to as Liens. [UST Tech] shall indemnify, defend and save harmless [Sverdrup] and Owner against Liens filed on the property of Owner by [UST Tech's] subcontractors, materialmen or suppliers for amounts they claim are due from [UST Tech] for Subcontract Work. Within ten (10) days of receiving notice from Owner or [Sverdrup] to do so, [UST Tech] shall obtain the release of any such liens. If [UST Tech] fails to do so within the time provided herein, [Sverdrup] may satisfy such Liens by payment notwithstanding [UST Tech's] defenses thereto and without liability to [UST Tech] or its surety therefor and may retain out of any payment due, or to become due to [UST Tech] thereafter, an amount sufficient to indemnify [Sverdrup] and Owner for such payment and any other expenses incurred by either of them as a result of such lien.

Southern's Brief at p. 3 (quoting the contract between Sverdrup and UST Tech); Gary's Brief at p. 2 (incorporating Southern's brief by reference). According to the Defendants, this provision demonstrates that UST Tech "was not entitled to payment from Sverdrup, unless it could warrant ... [that UST Tech] had ... paid Defendant[s] for the work which Defendant[s] had performed." Southern's Brief at pp. 3–4. Thus if UST Tech had "brought suit against Sverdrup to recover th[e] amount [owed], Sverdrup could successfully defend the claim, as [UST Tech] had not satisfied a material precondition to receive payment." *Id.* at p. 5.

Restated in terms more directly relevant to this Court's mode of analysis, the Defendants could be arguing that they did not usurp UST Tech's right of payment, for the simple reason that UST Tech had no such right. In assessing this argument, it must be remembered that the question here is whether Sverdrup's payment was in substance made on the debt that it owed to UST Tech. *See Zorn,* 212 B.R. at 567. The Defendants may be correct in arguing that this account payable was not a mature debt. But even if that is so, it is of course entirely possible that Sverdrup waived its rights under § 8.1.6 to withhold payment. Indeed, the contractual requirement that UST Tech "indemnify" Sverdrup against "[l]iens filed ... by [UST Tech's] subcontractors" seems to contemplate circumstances in which Sverdrup paid UST Tech prematurely—i.e., before sub-sub-contractors had been paid by UST Tech.

Put simply, the contention that a party has only a contingent right of payment does not

preclude the possibility that that party (or a creditor of that party), *see id.*, nevertheless collected the debt. Thus the contention that UST Tech had no present right of payment is irrelevant in this context.

■ Two other theories cited in the Defendants' motions are that (1) the money paid by Sverdrup was held in constructive trust for the Defendants' benefit; and (2) UST Tech exercised no control over the money which the Defendants received. *See* Southern's Brief at pp. 10–13. Because these arguments go to the issue of whether UST Tech owned an interest in money, they are of course not relevant to the question of whether the Defendants appropriated UST Tech's account receivable. *See generally Zorn*, 212 B.R. at 567. And since the continued viability of the account-receivable theory mandates denial of the Defendants' motions in any event, no purpose would be served in addressing whether they have established the lack of a genuine issue concerning UST Tech's interest in Sverdrup's funds.

These same questions crop up in a different context, however. The Plaintiff's own motions for partial summary judgment asserted that UST Tech "had sufficient control over the funds [paid to the Defendants] to demonstrate an interest in the funds." Plaintiff's Brief at p. 13. The Plaintiff may be entitled to the relief which he requests in his motion if, in fact, there is no sound basis for concluding that UST Tech lacked an ownership interest in the transferred funds. *See Arnold*, 908 F.2d at 56 (suggesting that the trustee might have prevailed notwithstanding the independent obligation if the third party had paid the preference defendant "us[ing] money that belonged to" the debtor); *see generally, Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995) (Summary judgment is appropriate "if the evidence is insufficient to reasonably support a jury verdict in favor of the nonmoving party."). But as will be explained, that conclusion would most assuredly be a reasonable one.

In cases involving "transfers by third parties [directly to the preference defendant], the diminution of estate doctrine asks whether the debtor controlled the property to the extent that he owned it and thus the transfer diminished his estate." *Hartley*, 825 F.2d at 1070. *Hartley's* nomenclature notwithstanding, the Court will refer to this rule as the "control" doctrine, if only for the sake of brevity.

■ *Hartley* did not explicitly define what it meant by "control." But it is fairly clear that the term focuses on the amount of discretion the debtor has with respect to how the funds are to be spent. *See id.* at 1071–72 (distinguishing a case cited by the trustee on the grounds "that the debtor, not [the party making the payment to the preference defendant], decided which creditor would receive the proceeds of the loan"). A subsequent Sixth Circuit decision reinforces that point:

> The real question here is whether the Debtor was actually able to exercise sufficient dominion and control over the funds to demonstrate an interest in property.... By itself, ... provisional credit might not evidence an interest of the Debtor in property; but the Debtor exercised dominion and control over the funds by making actual payment to a creditor. The Debtor surely had something of value during the period when the Bank was extending the provisional credit. Instead of writing [one] check ... the Debtor could have written several checks, paying off each of its creditors on a pro rata basis. Alternatively, the Debtor could have purchased a 40–foot yacht. The point is that the Debtor exercised significant control ... in choosing to pay off a single creditor. [*In re*] *Smith*, 966 F.2d [1527], 1531 [(7th Cir.), *cert. dismissed*, 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992)].

Applying this concept to the facts of the instant case, it seems to us that Mr. Montgomery had a similar measure of control over the funds represented by the kited checks he deposited at Third National. Montgomery could have used the kited checks to buy a 40–foot yacht, just as he could have used them to pay off creditors other than Third National.... [T]he point is that Montgomery exercised significant control ...; Montgomery could de-

cide ... whether to pay off Third National rather than paying off one of his smaller creditors ... and using what was left over to buy a yacht.

Because the debtor "could have purchased a yacht or acquired some other assets instead of paying his debt," the assets in the estate at the time of bankruptcy were less than they could have been.

*In re Montgomery,* 983 F.2d 1389, 1395 (6th Cir.1993). Thus a debtor "owns"—i.e., "controls"—money emanating from a third party if it is the debtor who dictates how that money is to be spent. *See also, e.g., In re Kemp Pacific Fisheries, Inc.,* 16 F.3d 313, 316 (9th Cir.1994) ("When a debtor uses the funds of a third party to pay an obligation of the debtor[,] the Court must look to the source of the control.... If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid independent of a third party whose funds are being used ... in payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer." (citation omitted)).

Applying this principle here, it can readily be seen that there is (at least) a "genuine issue" regarding the Plaintiff's contention that UST Tech owned an interest in Sverdrup's money. Sverdrup mailed its checks to UST Tech with a cover letter which described the checks as "payment of your invoice," and which instructed UST Tech to "forward joint checks to" the Defendants. Plaintiff's Exhibit D. The checks were made payable to the order of UST Tech *and* the sub-subcontractor. Southern's Exhibit 3; Gary's Exhibit 3. Thus it would seem that Sverdrup was telling UST Tech and the Defendants to divvy up the money which the checks represented on whatever terms those parties found agreeable. Under such circumstances, one could certainly infer that UST Tech had no control over Sverdrup's money so long as it lacked the joint payee's endorsement of the check. *See, e.g.,* Mich. Comp. Laws § 440.3110(4) ("If an instrument is payable to 2 or more persons not alternatively, it ... may be negotiated ... or enforced only by all of them."); Uniform Commercial Code Comment, § 3–110 ("If an

instrument is payable to X and Y, neither X nor Y acting alone is the person to whom the instrument is payable."). And since UST Tech never obtained those endorsements, one could plausibly argue, it never obtained control of the funds.

It appears, however, that this lack of actual control over Sverdrup's money does not necessarily mean that UST Tech had no interest therein. As *Hartley* explained:

[W]here the debtor transfers a security interest in return for the loan, the payment is ... a voidable preference to the extent the transaction depleted the debtor's estate. In *Steel Structures, Inc. v. Star Manufacturing Co.* ... [t]he court held that the transfer was a voidable preference to the extent of the value of the collateral given [by the debtor] to the third party [for the loan].... The Court did not articulate the reasons behind its conclusions.... We think, however, that the court reasoned that the loan presumably would not have been made but for the debtor's transfer of a security interest to the third party. *Thus, the debtor controlled the loan to the extent he gave security for it.* Consequently, the *Star* court held, the transfer of the proceeds was a voidable preference to the extent of the debtor's control, the value of the security.... [I]n the case before the Court, ... the only depletion of the debtor's estate resulted from his transfer of security interests to Midwest [the lender], which can be compared with the granting of a mortgage in *Steel Structures* .... In [that] ... case[,] the court[] determined that the amount of the voidable preference was equal to the value of the collateral, not the full amount of the loan to the debtor.

*Hartley,* 825 F.2d at 1071–72 (emphasis added). In keeping with this reasoning, *Hartley* remanded for a determination "as to the value of the assets which secured the loan from Midwest to the debtor." *Id.* at 1072.

■ Thus *Hartley* holds that the debtor is conclusively presumed to control borrowed funds to the extent he gave security to the lender. The Court will refer to this presumption as the "collateral value rule."

The Plaintiff argued that these cases call for application of that rule. He explained that "[t]he endorsement and delivery of the Check[s] resulted in a diminution of the amount which Debtor ... would otherwise have received from Sverdrup under the Contract and thereby reduced the assets available for other creditors." Plaintiff's Brief at pp. 14–15. Apparently, then, the trustee is contending that UST Tech gave up "value" in the form of a *pro tanto* assignment to the Defendants of its account receivable against Sverdrup.

It is by no means certain that this assertion even implicates the collateral value rule. *Hartley*, after all, addressed situations in which the "value" was extended to the party who made the challenged transfer—i.e., the third-party payor. *See Hartley*, 825 F.2d at 1068, 1071–72. Here, in contrast, it is the transferees who supposedly received the value. In further contrast to *Hartley*, the value conveyed by UST Tech did not serve as collateral, but was instead (per the Plaintiff's theory) conveyed outright. *See id.* at 1072 (suggesting that the debtor lacks the requisite control to the extent the loan is undersecured). But while these incongruities are perhaps not fatal to the Plaintiff's argument, there is another consideration which clearly distinguishes *Hartley*.

Only three years after the Sixth Circuit decided *Hartley*, it ruled in *Arnold* that a contractor's payment to a sub-subcontractor does not involve property of the debtor/subcontractor if the payee had an independent right to the payment. It is not clear whether this holding is limited to situations in which the sub-subcontractor actually enforced that independent right, or if it is sufficient that the right existed. *See Zorn*, 212 B.R. at 567–68.

However, even if *Arnold* is narrowly construed with regard to this point, the broader construction is more sensible, and hence the one most likely to be adopted by the Sixth Circuit. *See id.* at 568. This is so primarily because in this context, any designation as to whose claim is being paid (or whose right is being enforced) is "inherently arbitrary." *Id. See also id.* (suggesting that it would be simpler, from a practical standpoint, to limit judicial inquiry to the question of whether the independent obligation existed).

■ If we were to apply the collateral value rule in the manner urged by the Plaintiff, we would have to focus on the very issue which we believe should be disregarded—namely, whether Southern and Gary collected on their own right of payment or UST Tech's right of payment. So while the outer boundaries of *Hartley's* rule may be hard to define, we choose not to stretch those boundaries as far as the Plaintiff would like. Under these facts, we conclude that the existence of an independent obligation precludes application of the collateral value rule.[1]

The Plaintiff also argued that the money with which Sverdrup paid the Defendants was held in constructive trust for UST Tech's benefit. This kind of trust is invoked by courts as a matter of equity to prevent "unjust enrichment." *In re Omegas Group, Inc.*, 16 F.3d 1443, 1449 (6th Cir.1994) (citation omitted).

Since a constructive trust was not declared by court order prior to UST Tech's bankruptcy, *Omegas* arguably precludes this Court from doing so now. *See generally Zorn*, 212 B.R. at 571. The Court, however, can and will dispose of the trust argument without addressing that problematic issue.

In arguing for a constructive trust, the only authority which the trustee offered was the bankruptcy court's decision in *Gray Electric, supra* p. 577. That case is unpersuasive. *See Zorn*, 212 B.R. at 570–73. We therefore reject the proposition for which it was cited.

To summarize, one could reasonably infer from the record that (1) the Defendants either did or did not have an independent right of payment against Sverdrup; (2) Sverdrup paid its debt to UST Tech before that debt matured or became fixed; (3) UST Tech had

---

1. We assume here, as we must in considering the Plaintiff's motion for summary judgment, that the Defendants did in fact have an independent right to the payment received. *See Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090, 1092 (6th Cir. 1997).

no control over Sverdrup's money; (4) UST Tech conveyed nothing of value to the Defendants when it endorsed the joint checks from Sverdrup; and (5) there is no factual basis for declaring a constructive trust in favor of UST Tech. Consequently, none of the parties is entitled to summary judgment.

An appropriate order shall enter in each of the captioned cases.