In re UNDERGROUND STORAGE TANK TECHNICAL SERVICES GROUP, INC., d/b/a UST Tech, Debtor.

Michael A. MASON, Trustee of Underground Storage Tank Technical Services Group, Inc., d/b/a/ UST Tech, Plaintiff,

v.

FREESTONE SAND & GRAVEL, INC., Defendant.

Bankruptcy No. 95–30841.
Adversary No. 95–3057.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division–Flint.

May 7, 1997.

Jon A. Sherk, Detroit, MI, Special Counsel to Trustee.

Gerard T. Gallagher, South Bend, IN, for Defendant.

### OPINION REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ARTHUR J. SPECTOR, Bankruptcy Judge.

#### Introduction

On May 31, 1994, Underground Storage Tank Technical Services Group, Inc., entered into an agreement with Ryder Truck Rental, Inc., pursuant to which the former was to provide construction labor and materials for a Ryder facility in South Bend, Indiana. In connection with this project, UST Tech "subcontracted" with Freestone Sand & Gravel, Inc., for the performance of certain services.

Within 90 days pre-petition, Ryder made a payment by check to Freestone in the amount of $7,741.50. This payment was pursuant to UST Tech's prior written authorization, as required under the terms of a "Direct Pay Agreement" signed by Ryder and UST Tech.

█ In this adversary proceeding, the trustee alleges that the payment is subject to avoidance under 11 U.S.C. § 547(b). He filed motion for summary judgment on February 26, 1997. Although the Defendant did not respond to this motion, that fact does not mean that the motion must be granted. See F.R.Civ.P. 56(e) (incorporated by F.R.Bankr.P. 7056) (The non-movant "must set forth specific facts showing that there is a genuine issue for trial. If the [non-movant] . . . does not so respond, summary judgment, if appropriate, shall be entered. . . ." (emphasis added)); see also, e.g., United States v. One Parcel of Real Property, 27 F.3d 327, 329 n. 1 (8th Cir.1994); Tobey v. Extel/JWP, Inc., 985 F.2d 330, 332 (7th Cir.1993); Guarino v. Brookfield Twp. Trustees, 980 F.2d 399, 407 (6th Cir.1992); Anchorage Assocs. v. Virgin Islands Board of Tax Review, 922 F.2d 168, 175 (3d Cir.1990); Jaroma v. Massey, 873 F.2d 17, 20 (1st Cir.1989) (per curiam); John v. Louisiana, 757 F.2d 698, 709 (5th Cir.1985). And for the reasons which follow, granting the relief requested by the trustee would be inappropriate.

#### Discussion

Section 547(b) provides in pertinent part:

[T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

   (A) on or within 90 days before the date of the filing of the petition; . . .

(5) that enables such creditor to receive more than such creditor would receive if—

   (A) the case were a case under chapter 7 of this title;

   (B) the transfer had not been made; and

   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Element (3) is presumed to be satisfied, see 11 U.S.C. § 547(f), and the trustee included with his motion solid evidence that the other enumerated elements are satisfied as well. See Trustee's Exhibits A, C, F, G, L, O and P. The Defendant countered with no evidence to the contrary. Thus for purposes of considering the Plaintiff's motion, the Court deems each of these requirements to be met. See generally, e.g., Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 150 (6th Cir. 1995) ("[T]he nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment."); cf. Guarino, 980 F.2d at 406 ("[I]t seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion [for summary judgment].").

■ Less straightforward, however, is the question of whether Ryder's payment involved "an interest of the [D]ebtor in property," as § 547(b)'s preamble requires. In this regard, there are basically two theories under which the trustee could proceed. One is that UST Tech owned an interest in the money used by Ryder to pay Freestone. The other is that in accepting payment from Ryder, Freestone in essence collected on an account that Ryder owed to UST Tech. *See generally Mason v. Zorn Indus.*, 212 B.R. 564, 566–67 (Bankr.E.D.Mich.1997).

The trustee appears to invoke the former mode of analysis, as his brief focuses on Ryder's "funds," and makes reference to "the debtor's property interest in money." Trustee's Brief at p. 5. Moreover, the brief relies on what this Court has called the "control" doctrine, which holds that "a debtor 'owns'—i.e., 'controls'—money emanating from a third party if it is the debtor who dictates how that money is to be spent." *Mason v. Southern Sanitation*, 212 B.R. 574, 579–580 (Bankr.E.D.Mich.1997). *See* Trustee's Brief at pp. 5–7. A closer reading of the trustee's motion, however, leads the Court to conclude that it is premised on the theory that Freestone obtained UST Tech's account receivable.

Ryder's check was drawn on a " 'suspense account' [which] was funded by three checks made payable jointly to ... [UST Tech] and Ryder for amounts Ryder owed to ... [UST Tech] on ... [other construction] jobs.". *Id.* at p. 3. But the fact that Freestone was, loosely speaking, paid by Ryder with money identified as being owed to UST Tech would not appear to be inherently significant for purposes of determining whether UST Tech "owned" that money. *See Zorn*, 212 B.R. at 572–73.

Nor does the Direct Pay Agreement purport to vest UST Tech with specific rights in the so-called "suspense" account. No showing has been made, and indeed the trustee does not even seem to be arguing, that UST Tech controlled certain dollar bills or accounts owned by Ryder. Rather, the trust-ee's argument appears to boil down to the simple proposition that, if and to the extent Ryder made payment on its contractual obligation to UST Tech, the latter could designate how this payment was to be made.

So understood, the trustee's argument can be restated as follows: pursuant to the Direct Pay Agreement, UST Tech had the power to assign its account receivable to certain of its unpaid subcontractors, and Ryder was bound by any such assignment. When his position is stated in these terms, it becomes obvious that the trustee is arguing that Ryder's payment was in substance made on the account which it owed to UST Tech. Rather than asserting that UST Tech owned an interest in Ryder's money, then, the Court understands the gist of the trustee's motion to be that the transfer to Freestone involved UST Tech's account receivable—i.e., the contractual right of UST Tech to be paid by Ryder for the work it performed.

That being the case, it seems pointless to focus on "control" since, by definition, the account in question belonged to UST Tech. *See Zorn*, 212 B.R. at 567 (The question of the debtor's control over property has "no logical role to play" with respect to the issue of whether the preference defendant appropriated the debtor's account receivable.). Why, then, did the trustee invoke the control doctrine? The Court believes that a case upon which the trustee relied, *In re Hartley*, 825 F.2d 1067 (6th Cir.1987), provides the answer to this question.

In *Hartley*, the debtor obtained a $500,000 loan from Midwest Emery Freight Systems, Inc. Rather than giving the money to the debtor, however, Midwest paid the loan proceeds directly to Peoples Banking Company, in partial satisfaction of the debtor's overdrawn checking account. *Id.* at 1068.

The trustee sued Peoples to recover the payment from Midwest as a preference. In deciding whether the debtor owned the requisite property interest, the Sixth Circuit seemingly focused on the money paid by Midwest to Peoples. *See, e.g., id.* ("The principal issue ... is whether the debtor owned the $500,000 paid to Peoples ....");

*id.* at 1070 (indicating that the control doctrine is implicated " '[w]here there is a question as to the debtor's ownership of the money' " (citation omitted)); *id.* at 1072 (" ... Midwest, not the debtor, controlled the disposition of the funds....."). As will be explained, however, this interpretation of *Hartley* is untenable.

■ "The relevant time frame for ascertaining the nature of the debtor's interest in transferred property is, of course, immediately prior to the transfer." *Zorn*, 212 B.R. at 572 (citing *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990)). If *Hartley* was in fact treating the transfer at issue as involving cash, then, the question would boil down to whether, prior to transfer, Midwest granted the debtor property rights in any of its money or checking accounts. Yet the court never analyzed the case in such terms.

Even more importantly, an affirmative answer to that inquiry would be spectacularly wrong. After all, if Midwest gave anything of value to the debtor pre-transfer, it was simply a commitment to make the loan. *See Hartley*, 825 F.2d at 1068–69. Had Midwest reneged on this commitment, the debtor may have had a cause of action, but it surely could not prevail on the theory that it "owned" a consensual interest in any of Midwest's assets. *See generally* Restatement, Second, Contracts § 351, Comment e and Illustrations. If *Hartley* is in fact a "cash-transfer" case, then, both the court's reasoning and its holding are unfathomable.

On the other hand, the decision in *Hartley* makes sense if one assumes that the court was not speaking literally when it identified "money" or "funds" as the subject of the transfer, and that what it really meant by such terms was the debtor's right of payment. Analyzed from this perspective, *Hartley*'s outcome is defensible: Peoples didn't appropriate the debtor's right of payment, for the simple reason that the debtor had no such right. Stated more precisely, the debtor had only a technical right of payment, because it was subject to the condition that the money be turned over to Peoples. Thus it was Peoples that owned what might be called a "beneficial" interest in the debtor's

account receivable, with the debtor holding only bare "legal" title therein. *Cf. Selby v. Ford Motor Co.*, 590 F.2d 642, 645 (6th Cir. 1979) ("Viewed as a traditional trust, the beneficial interests in the trust fund would not be the 'property' of the bankrupt contractor or his estate in bankruptcy. The subcontractors would own the beneficial title to the trust, and the contractor would simply hold legal title to the funds as trustee.").

This interpretation is reinforced by *Hartley's* holding to the effect "that the debtor is conclusively presumed to control borrowed funds to the extent he gave security to the lender," a holding which this Court dubbed the "collateral value rule." *Southern Sanitation*, 212 B.R. at 580. *See Hartley*, 825 F.2d at 1071–72. If *Hartley* is an account-receivable case, this holding can plausibly be defended on the pragmatic theory that, as compared to a borrower who gives no security, a borrower who puts up collateral is in a stronger position to dictate how the loan proceeds are to be applied.

Of course, the foregoing theory is highly debatable, as it overlooks the fact that even collateralized lenders often specify how the loan proceeds can be spent. For example, residential purchase-money mortgagors are routinely obligated by contract to apply the borrowed funds to the purchase of the residence.

But if *Hartley* is a cash-transfer case, then the soundness of its collateral value rule is even more suspect. It would be absurd, after all, to suggest that the question of whether—and the extent to which—the debtor owned a consensual, pre-transfer interest in Midwest's money turned on the value of the security interest granted to Midwest by the debtor.

For these reasons, the Court concludes that *Hartley's* discussion of "control" pertained not to the lender's money, *per se*, but to the debtor's ability to designate the ultimate recipient of the loan. *Cf. In re Montgomery*, 983 F.2d 1389, 1395 (6th Cir.1993) (a post-*Hartley* preference action filed against a bank in which the same court ruled that the debtor had control over "funds represented

by ... checks he deposited at" the bank).[1] Since the party so designated has no more than a right of payment vis-à-vis the lender, *Hartley* is in essence an account-transfer case, rather than a cash-transfer case.

■ Which brings us back to the original question, why look at "control" in an account-transfer case? Here's the answer: consistent with *Hartley,* the debtor "owns" an account only if she "controls" it, and she controls it if she has an unfettered right to the proceeds of the account. *See Hartley,* 825 F.2d at 1070–72; *see also Montgomery,* 983 F.2d at 1395.

In the usual course of events, the Court's next task would be to determine whether UST Tech had sufficient "control" over the Ryder account. As already indicated, however, it is not at all clear from the trustee's motion that he is identifying the transferred property as a right of payment, rather than cash. Given *Hartley* 's opacity on this point, the trustee's own lack of clarity and/or confusion is understandable. It nevertheless would be unfair to the Defendant to consider the account-appropriation theory as having been raised at this juncture. *See John Deere Co. v. American Nat'l Bank,* 809 F.2d 1190, 1191–92 (5th Cir.1987) ("[T]his point ... was not raised by the Bank in a manner that would be sufficient to put John Deere on notice that failure to present evidence of damages could be grounds for summary judgment.... Since the district court's grant of summary judgment was not based on grounds advanced by the Bank, and no opportunity was given to John Deere to respond, we must reverse."); *cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, *so long as the losing party was on notice* that she had to come forward with all of her evidence." (emphasis added)). This is particularly true here because the theory implicates a question which the trustee's motion ignores—that is, whether Ryder owed Freestone an "independent" obligation to make the payment under challenge. *See Zorn,* 212 B.R. at 567 ("[*In re* ] *Arnold* [, 908 F.2d 52 (6th Cir.1990) ] should ... be construed as holding that the third party's independent obligation established that the transfer did not constitute a seizure of the debtor's account receivable.").

In short, the trustee did not clearly articulate any theory pursuant to which the Court must conclude "as a matter of law" that UST Tech possessed rights in the property transferred. F.R.Civ.P. 56(c) (incorporated by F.R.Bankr.P. 7056). Accordingly, his motion will be denied.[2]

An appropriate order shall enter.

---

1. *Montgomery* is instructive because it is so obvious in that case that the debtor had no control over money, as such: The checks he gave to the preference defendant were simply assignments of his claim against the bank upon which the checks were drawn. *See, e.g., Citizens Bank v. Strumpf,* 516 U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258, 264 (1995) ("Respondent's ... view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor...."); *Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992) ("A person with an account at a bank enjoys a claim against the bank for funds in an amount equal to the account balance. Under the UCC, a check is simply an order to the drawee bank to pay the sum stated...."); *In re USA Diversified Products,* 100 F.3d 53, 55 (7th Cir.1996) ("... Diversified did not own the money in the account, but was merely a creditor of Merrill Lynch (a financial intermediary analogous to the bank in the *Strumpf* case)."); *In re Bernard,* 96 F.3d 1279, 1283 (9th Cir.1996) ("Instead of owning money sitting in their accounts, the Bernards owned claims against their bank."). As in *Hartley,* the references in *Montgomery* to "funds" are simply shorthand for "the right to receive funds."

2. The trustee also argued that he is entitled to summary judgment with respect to affirmative defenses asserted in Freestone's answer. Since an issue remains concerning a primary element of the trustee's cause of action, summary judgment must of course be denied in any event. Arguably, these defenses are subject to being effectively "stricken" for lack of proof. *See* F.R.Civ.P. 56(d) (incorporated by F.R.Bankr.P.

---

7056); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure:* Civil 2d §§ 2734, 2737. However, there is no reason to believe that proceeding in this fashion would in this case substantially facilitate the task of the parties or the Court. *See generally id.* at § 2737 (Rule 56(d) may be utilized "when it would be practicable to save time and expense and to simplify the trial.... [I]f the court determines that entering a partial summary judgment by identifying the facts that no longer may be disputed would not materially expedite the adjudicative process, it may decline to do so...."). The Court therefore will not address the trustee's motion insofar as it relates to the affirmative defenses.